**GREENBERG TRAURIG, LLP**
Valerie W. Ho (SBN 200505) (hov@gtlaw.com)
Michael S. Lawrence (SBN 255897) (lawrencem@gtlaw.com)
Robert S. Freund (SBN 287566) (freundr@gtlaw.com)
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Attorneys for Plaintiff
Tech-4-Kids, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| TECH-4-KIDS, INC.,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>SPORT DIMENSION, INC.,<br><br>　　　　　Defendant.<br>───────────────────<br>SPORT DIMENSION, INC.,<br><br>　　　　　Counterclaimant,<br><br>vs.<br><br>TECH-4-KIDS, INC.,<br><br>　　　　　Counterdefendant. | **CASE NO. 2:12-CV-06769-PA-AJW**<br><br>**NOTICE OF MOTION AND MOTION OF PLAINTIFF TECH-4-KIDS, INC.'S FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Proposed Statement of Uncontroverted Facts and Conclusions of Law, Declarations of Brad Pedersen and Michael S. Lawrence, and Proposed Order Filed Concurrently herewith]<br><br>DATE:　　June 3, 2013<br>TIME:　　1:30 p.m.<br>CTRM:　　15<br><br>**Judge: Honorable Percy Anderson** |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 3, 2013, at 1:30 p.m., or as soon thereafter as counsel may be heard, in the courtroom of Honorable Percy Anderson, located at 312 North Spring Street, Los Angeles, California 90012, Courtroom 15, Plaintiff and Counter-Defendant Tech-4-Kids, Inc. ("Plaintiff" or "T4K") will move, pursuant to Federal Rule of Civil Procedure 56, for partial summary judgment on its third claim for Breach of Contract (the "Motion").

The Motion is made on the grounds that there is no genuine dispute as to any of the legal elements of the cause of action at issue and Tech-4-Kids is, therefore, entitled to judgment as a matter of law. Specifically, the undisputed factual record demonstrates that in March 2009, Sport Dimension's President, Kurt Rios and Tech-4-Kids' President, Brad Pedersen, entered into a distribution agreement pursuant to which Sport Dimension agreed to distribute Tech-4-Kids' snow bike products to specific retailers. The undisputed factual record demonstrates that Sport Dimension breached that agreement when it failed to distribute the product in the manner promised. Instead of using its best efforts to sell Tech-4-Kids' products, Sport Dimension secretly developed a competing product and offered it to retailers that it had agreed not to approach, thus causing injury to Tech-4-Kids. For purposes of this Motion, Tech-4-Kids seeks to establish liability for breach of contract. The damages suffered by Tech-4-Kids will be an issue to be determined by the trier of fact.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on April 23, 2013.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Proposed Statement of Uncontroverted Facts and Conclusions of Law, Declarations of Brad Pedersen and

LA 130872455v1

1  Michael S. Lawrence, and the attached exhibits, the pleadings and papers on file in this

2  action, and such further evidence and argument as the Court may consider at the hearing.

3

4  DATED:  May 3, 2013                              **GREENBERG TRAURIG, LLP**

5

6                                                              By:   _/s/ Valerie W. Ho_____
                                                                      Valerie W. Ho
7                                                                     Michael S. Lawrence
                                                                      Robert S. Freund
8                                                                     Attorneys for Plaintiff and Counter-Defendant
9                                                                     Tech-4-Kids, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LA 130872455v1

# **TABLE OF CONTENTS**

I.   INTRODUCTION.................................................................................. 1

II.  STATEMENT OF FACTS .................................................................. 3

    A.   The Parties and Their Business.................................................. 3

        1.   Tech-4-Kids................................................................... 3

        2.   Sport Dimension............................................................ 4

    B.   The Distribution Agreement Between Sport Dimension and Tech-4-Kids ... 4

    C.   The Parties Engage in Conduct Probative of the Belief that a Contract Had Been Formed.......................................................................... 7

        1.   Sport Dimension's Subsequent Conduct Indicates Belief that Contract Had Been Formed................................................ 7

        2.   Tech-4-Kids' Subsequent Conduct Indicates Belief that Contract Had Been Formed ................................................ 9

    D.   Sport Dimension's Breach of the Distribution Agreement ......................... 11

III. ARGUMENT ..................................................................................... 13

    A.   Legal Standard ...................................................................... 13

    B.   Tech-4-Kids is Entitled to Partial Summary Judgment on its Breach of Contract Claim (Third Claim for Relief)..................................... 14

        1.   There is No Dispute of Material Fact that the Parties Entered Into a Distribution Agreement in March 2009................................. 14

        2.   There is No Dispute of Material Fact That Plaintiffs Performed or Had an Excuse for Not Performing Under the Contract................. 21

        3.   There is No Dispute of Material Fact that Sport Dimension Breached its Agreement .................................................................. 21

            a.   Sport Dimension failed to make commercially reasonable efforts in 2009 ...................................................... 21

            b.   Sport Dimension failed to make any efforts to sell the product after 2009 ..................................................... 23

            c.   Sales to ███████ ....................................................... 24

        4.   There is No Dispute of Material Fact that Tech-4-Kids Was Damaged................................................................ 25

## TABLE OF AUTHORITIES

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242 (1986).............................................................................. 13

*CEC Entertainment, Inc. v. Kobra Properties*
    No. 2:06-CV-00639-JAM-EFB, 2008 WL 4779567 (E.D. Cal. Oct. 27, 2008) .... 15

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)...................................................................... 13, 22

*E. & J. Gallo Winery v. Andina Licores S.A.*
    440 F. Supp. 2d 1115 (E.D. Cal. 2006)................................................ 15

*Gallagher v. Holt*
    2:08-CV-03071 JFM C, 2012 WL 3205175 (E.D. Cal. Aug. 3, 2012) ................ 18

*Hershey Foods Corp. v. Collegiate Marketing, Inc.*, Case No. 95 Civ. 10526(SAS),
    1997 WL 772768 (S.D.N.Y. Dec. 15, 1997) ......................................... 22

*Hua v. MEMC Electronic Materials, Inc.*
    No. C 09-555 JF (RS), 2009 WL 1363545 (N.D. Cal. May 14, 2009) ................ 19

*Investment Service Co. v. Roper*
    588 F.2d 764 (9th Cir. 1978)........................................................... 19

*Liang v. Cal-Bay Intern., Inc.*
    No. 06cv1082–WMc, 2012 WL 1282984 (S.D. Cal. Apr. 13, 2012).................... 25

*Morris v. Guetta*
    LA CV12-00684 JAK, 2013 WL 440127 (C.D. Cal. Feb. 4, 2013)....................... 13

*Safadi v. Citibank, N.A.*
    No. 12–1356 PSG, 2012 WL 47147875 (N.D. Cal. Oct. 2, 2012) ........................ 14

*Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*
    637 F. Supp. 2d 712 (C.D. Cal. 2008) ................................................ 22

*Seaman v. Pyramid Technologies, Inc.*
    SACV 10-00070 DOC, 2011 WL 5508971 (C.D. Cal. Nov. 7, 2011)................... 14

*Thornhill Pub. Co., Inc. v. GTE Corp.*
    594 F.2d 730 (9th Cir. 1979)........................................................... 13

*Travelers Cas. And Sur. Co. v. American Intern. Surplus Lines Ins. Co.*
    465 F. Supp. 2d 1005 (S.D. Cal. 2006)................................................ 14

*U.S. v. Dahan*
    369 F. Supp. 2d 1187 (C.D. Cal. 2005) ............................................... 15

*United Brotherhood of Carpenters and Joiners of America, Lathers Local 42-L v.*
*United Brotherhood of Carpenters and Joiners of America*
73 F.3d 958 (9th Cir. 1996) ................................................................. 16

*Warehousemen's Union Local No. 206 v. Continental Can Co.*
821 F.2d 1348 (9th Cir. 1987) ............................................................. 14

*Waterbury v. T.G. & Y. Stores Co.*
820 F.2d 1479 (9th Cir. 1987) ............................................................. 16

**State Cases**

*Apex LLC v. Sharing World, Inc.*
206 Cal. App. 4th 999 (2012) .............................................................. 19

*First Commercial Mortgage Co. v. Reece*
89 Cal. App. 4th 731, 108 Cal. Rptr. 2d 23 (2001) ............................. 14

*Westoil Terminals Co. v. Industrial Indemnity Co.*
110 Cal. App. 4th 139 (2003) .............................................................. 15

**State Statutes**

California Commercial Code, Section 2202(a) ..................................... 24

California Commercial Code, Section 2204(1) ..................................... 15

**Federal Rules**

Federal Rules of Civil Procedure, Rule 56(a) ............................... 13, 25

Federal Rules of Civil Procedure, Rule 56(g) ............................... 13, 25

**Other Authorities**

Schwarzer et al., Federal Civil Procedure Before Trial (Rutter 2013) §14:36 ................. 25

LA 130872455v1

# I.   **INTRODUCTION**

This lawsuit seeks recourse for a predatory scheme that has become all too frequent in the competitive manufacturing and import pipeline from China.  It arises from a March 2009 distribution relationship that Defendant Sport Dimension, Inc. ("Sport Dimension") and its President Kurt Rios (along with its owner Joseph Lin) initiated with Plaintiff Tech-4-Kids, Inc.'s ("Tech-4-Kids") President, Brad Pedersen.  Pursuant to this agreement, Sport Dimension agreed to sell Tech-4-Kids' snow bikes to U.S. retailers who were not already Tech-4-Kids' actual or identified prospective customers.  A snow bike is a snow sled for children with three skis on the bottom that is modeled after motorized snow mobiles.  Rios indicated that Sport Dimension was impressed with Tech-4-Kids' snow bike product, the Snow Moto, and was eager to help Tech-4-Kids, then a small Canadian company, enhance its U.S. presence.  As a Canadian company, Tech-4-Kids was enticed by the offer which purported to support its efforts to further penetrate the U.S. winter goods market.

Over the course of their March 2009 two-week email exchange, Pedersen and Rios negotiated a distribution agreement which Rios accepted on March 17, 2009.  Under the terms of the agreement, Sport Dimension agreed to sell as many of the Snow Motos as possible and, in exchange, Tech-4-Kids would sell the Snow Motos to Sport Dimension at substantially reduced special wholesale pricing – pricing that had not been extended to anyone else, including Tech-4-Kids' own retail customers.  Sport Dimension also agreed not to approach customers to whom Tech-4-Kids was already selling the Snow Motos or customers that Tech-4-Kids at the time was actively approaching, including ███████  ███████████████████████████████████████.  The point of the distribution agreement, as both parties acknowledged at the time, was to enhance Tech-4-Kids' penetration into the U.S. market in exchange for sharing margin with Sport Dimension.

During and subsequent to these discussions, Pedersen provided Rios with highly confidential trade secret information, relating to among other things, pricing, cost, margin, customers, point of sales information, sales statistics, marketing information, and

Tech-4-Kids' upcoming product lineup with the understanding that the information would be treated as confidential. Rios acknowledged during the conversations with Pedersen that Tech-4-Kids would be providing Sport Dimension with sales support information specifically for purposes of supporting Sport Dimension's sales efforts on behalf of Tech-4-Kids.

After Rios accepted the deal, Sport Dimension led Tech-4-Kids to believe that Sport Dimension was making efforts to sell the Snow Moto to U.S. retailers. However, Sport Dimension's own Vice President of Sales, Todd Richards, admitted during discovery that

As it turned out, Sport Dimension had no intention of actually distributing Tech-4-Kids' products. Instead, armed with (a) Tech-4-Kids' confidential product sell-thru rate, pricing, and retailer margin information and (b) the market information Richards obtained from calls to retailers, Sport Dimension entered the market within months. Worse, it offered its competing product to Tech-4-Kids' customers            (a retailer it had previously agreed not to approach). With insight into Tech-4-Kids' pricing, it was able to undercut Tech-4-Kids and steal a substantial portion of its pioneering snow bike business.

Tech-4-Kids has sued Sport Dimension for (1) breach of contract; (2) promissory estoppel; (3) breach of the covenant of good faith and fair dealing; (4) fraud; (5) misappropriation of trade secrets; and (6) tortious interference with prospective economic advantage. This Motion seeks judgment as a matter of law on the narrow issue of liability on Tech-4-Kids' breach of contract claim. Partial summary judgment in Tech-4-Kids' favor is appropriate here because there is no disputed issue of material fact that the parties entered into a distribution agreement in March 2009. The email exchanges between Rios and Pedersen reflect an unambiguous agreement of terms,

2

including price, products, target market, and expected sales efforts. On March 17, 2009, Rios responded to Pedersen's counter-offer by stating: *"Brad, We are good to go. We accept your new higher prices listed below along with* ▓▓▓▓▓▓▓▓ *for shipping."* The email exchange – and Rios's ultimate acceptance of its terms – is unambiguous and unequivocal. There can be no reasonable dispute that the exchange constitutes a binding agreement between the parties. Both parties' subsequent conduct only serves to confirm an agreement existed, as discussed in more detail below.

Sport Dimension breached the agreement by (a) not using its best efforts in 2009 to distribute Tech-4-Kids' products, but rather made a single phone call to some customers to test interest; (b) not making any efforts at all after 2009 to distribute Tech-4-Kids' products, and in fact, offering a competing product in early 2010 and in 2011; and (c) selling its own snow bike to ▓▓▓▓ when it had agreed that that account was "off limits."

Sport Dimension at various times has contended that no agreement existed between the parties, but that it had tried to sell Tech-4-Kids' products to certain customers. Sport Dimension cannot have it both ways. Either there was attempted performance (albeit inadequate), in which case there was an agreement, or Sport Dimension committed fraud as it had no intention of acting as Tech-4-Kids' distributor at the time it approached Tech-4-Kids.

For purposes of this Motion, however, the Court need not decide all of these factual issues. The Court need only determine the legal issue of whether there was an unambiguous agreement between the parties, whether Sport Dimension breached the agreement thereby causing damage to Tech-4-Kids in an amount to be proven at trial. Partial summary judgment on the contract claim should be granted.

## II.   STATEMENT OF FACTS

### A.   The Parties and Their Business

1.   Tech-4-Kids

Tech-4-Kids is a Canadian company that develops, manufactures and sells

3

innovative toys and other products for children, including its pioneering snow bike product. Tech-4-Kids' snow bike, also referred to as the "Snow Moto Snow Sled," is the first of its kind with three small skis on the bottom and a body modeled after full sized motorized snow mobiles. (SUF ¶ 1.)  It has an adjustable seat, protective handle bars, a primarily decorative nose piece, suspension, braking system and licensed graphics.  (SUF ¶ 2.)  The Snow Moto is licensed under three brands, Ski-Doo, Polaris, and X-Games, ███████████████████████████████████████ (SUF ¶ 3.)  The Snow Moto was a highly successful product for Tech-4-Kids, which was a small company when the product first launched in 2007. (SUF ¶ 4.)

In 2009, Tech-4-Kids first sold the Snow Moto to ██████ as part of a test sale program that was extremely successful.  (SUF ¶ 5.)  The following year, ██████ originally purchased ███ Snow Moto units.  (SUF ¶ 6.)  Early point-of-sales statistics in 2010 indicated that ████ would sell out of the Snow Moto even before reaching the peak sales period in December.  (SUF ¶ 7.)  In order to meet demand, ████ ordered additional units at the last minute, purchasing a total of approximately ████ units of the Polaris model in 2010.  (SUF ¶ 8.)

2.   Sport Dimension

Defendant Sport Dimension is primarily a distributor of water sports products, such as wetsuits and floatation devices.  Sport Dimension is owned by Joseph Lin ("Lin").  (SUF ¶ 9.)  Defendant Kurt Rios ("Rios") is President of Sport Dimension. (SUF ¶ 10.)[1]  Prior to being introduced to Tech-4-Kids' Snow Moto, Sport Dimension never had a snow bike product in its line-up.  (SUF ¶ 12.)

B.   **The Distribution Agreement Between Sport Dimension and Tech-4-Kids**

On or about March 3, 2009, Kurt Rios, on behalf of Sport Dimension, sent an email to Brad Pedersen ("Pedersen"), the President of Tech-4-Kids.  (SUF ¶ 13.)  Rios

---

[1] Sport Dimension is closely related to, and believed to be an alter-ego of Stallion Sport Ltd., a Hong Kong company owned by Joseph Lin's brother.  (SUF ¶ 11.)

told Pedersen that he had seen some of Tech-4-Kids' snow bike models at ████████ ████████████████████████████ and was interested in exploring the possibility of becoming Tech-4-Kids' U.S. distributor of the Snow Moto.[2]  (SUF ¶ 14.)

In a March 4 email, Pedersen clearly explained to Rios what the purpose of such a deal would be: "I also want to be clear that if we were to consider this, our current [account] base would be off limits unless there was some compelling reason to consider otherwise.  The value add for us is getting better penetration into the US market beyond what we have been able to achieve."  (SUF ¶ 16.)  In other words, Tech-4-Kids wanted Sport Dimension to help expand its U.S. distribution of the Snow Moto models to retailers with whom Tech-4-Kids had not yet established a relationship.

Over the course of the two week email dialogue that ensued, with the subject line "USA Distribution," Rios indicated repeatedly that he was interested in entering into a contractual relationship with Tech-4-Kids.  (SUF ¶ 17.)  In his initial March 3, 2009 email, Rios stated to Pedersen that Sport Dimension "would hope that we could come to some agreement so that we could make sales calls this year before all commitments have been made."  (SUF ¶ 18.)  In a subsequent March 4, 2009 email in the same chain, Rios stated to Pedersen that Sport Dimension "would like to offer all three of [Tech-4-Kids' snow bike] brands as it makes sense for your existing distribution and where it would make sense to us if we had to offer an exclusive."  (SUF ¶ 19.)  Later on March 4, Rios wrote that Sport Dimension "reviewed the cost sheet [sent by Tech-4-Kids] *to see if we can put some sort of deal in place or arrangement* (emphasis added)."  In the same email, Rios stated that "I look forward to us being able to speak tomorrow and hopefully put an agreement together."  (SUF ¶ 20.)  In a subsequent March 10, 2009 email, Rios again said "I hope that we can put a deal together."  (SUF ¶ 21.)

---

[2] By 2009, Tech-4-Kids had already experienced substantial success in selling its snow bike products in Canada, due in part to its existing relationship with ████████████ and ████.  Tech-4-Kids also successfully sold its snow bikes to ████████████████ (SUF ¶ 15.)

On March 17, 2009, the parties agreed upon and mutually accepted the following terms which are reflected throughout the email chain:

Price – In a March 9, 2009 email, Pedersen rejected Rios's previous proposal of ███ per unit and counter-proposed ███ for the X-Games Snow Moto and ███ for the Ski-Doo and Polaris brands.  (SUF ¶ 22.)  On March 10, Rios accepted these prices – "Yes, we can accept the following prices."  (SUF ¶ 23.)  However, in light of Rios's refusal to pay an advance, Pedersen proposed increased pricing of ███ for the X-Games brand and ███ for the Ski-Doo and Polaris models. (SUF ¶ 24.)  Rios ultimately accepted this pricing on March 17, 2009. (SUF ¶ 25.)

Accounts – When discussions began, Pedersen explained to Rios that Tech-4-Kids would only enter into a distribution agreement that exposed it to new U.S. retailers as opposed to retailers with whom Tech-4-Kids already had a preexisting relationship. (SUF ¶ 16.)  In his March 9 email, Pedersen identified as "off limits" to Sport Dimension the following retailers: ███████████ (SUF ¶ 26.)  On March 10, Rios confirmed this list of off limit accounts with the single variation -- ███████████ (SUF ¶ 27.)  Later that same day, Pedersen corrected Rios ███████████ (SUF ¶ 28.)  Pedersen stated that "your list of accounts is correct except as it stands now we will also handle ███████████ (SUF ¶ 29.)

Quantity – In his March 9 email, Pedersen asked for a minimum purchase commitment of ███ Snow Moto units.  On March 10, Rios rejected that request but committed to "try and sell as much as we can."  (SUF ¶ 30.)

Term – Multi-year distribution relationships are standard in the industry.  (SUF ¶ 31.)  In fact, when Rios told Pedersen in July 2009 that the ███████ sale had not gone through, he stated, "Sorry this did not work out better for both of us, this is a good item, and maybe with a better retail climate we will have better luck next year," thus confirming to Pedersen that the distribution agreement would continue into the 2010

sales season.[3]

Sales Support – Pedersen also offered to make marketing information available to assist Sport Dimension in its distribution efforts.  Rios responded on March 10:  "Thanks and appreciated, any support to help us become experts in your category of products would be appreciated.  In closing, we see this as a great opportunity to help get more exposure for your product in the market."  (SUF ¶ 33.)

Following the above email exchanges, and a request by Rios for samples of the various Snow Moto models, on March 17, 2009, Rios wrote: *"Brad, We are good to go. We accept your new higher prices listed below along with* ███████████ *for shipping."*  (SUF ¶ 34.)  Rios also stated "I will up date [sic] you as we progress."  (SUF ¶ 35.)  Pedersen responded a few hours later that he was "[g]lad to move forward."  (SUF ¶ 36.)  The pricing that the parties ultimately agreed upon is, to date, the lowest special wholesale pricing that Tech-4-Kids has offered to any distributor or retailer for the Snow Moto product. (SUF ¶ 37.)

**C.   The Parties Engage in Conduct Probative of the Belief that a Contract Had Been Formed**

    1.   Sport Dimension's Subsequent Conduct Indicates Belief that Contract Had Been Formed

Sport Dimension's own conduct indicates a belief on its part that it had entered into an agreement with Tech-4-Kids:

Sales Efforts:  In his initial email to Pedersen, Rios stated that "we would hope that we could come to some sort of agreement *so that we could make sales calls this year before all commitments have been made*." (emphasis added)  (SUF ¶ 18).  Confirming such an "agreement" had been reached, a mere two weeks after accepting Pedersen's

---

[3] An understanding of the sales cycle for winter merchandise is relevant to this Motion. Manufacturers and wholesalers generally schedule their product pitches to retailers in December through May for the next snow season.  Winter products are typically shipped to retailers around August and the merchandise is generally shelved in September for the upcoming winter season.  (SUF ¶ 32.)

terms, Sport Dimension claims it began offering the Snow Moto to its customers, albeit unsuccessfully. (SUF ¶ 38.) Sport Dimension's Vice President of Sales, Todd Richards ("Richards"), claims ███████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████. (SUF ¶ 39.) Rios also attempted to sell the Snow Moto to at least one of his accounts. On April 2, 2009, he sent an email with a price quote for the Ski Doo Snow Moto to ████████. (SUF ¶ 40.) (SDI 015723) In his email, he proposed that ████████ sell the product in its ████████ ████████." (SUF ¶ 41.) Rios later indicated to Pedersen in July 2009 that he finally heard back from ██████ and that ██████ declined to proceed with the proposed test sale. (SUF ¶ 42.) Rios stated that he hoped to "have better luck next year." (SUF ¶ 42.)

Compliance with the "Off Limits" List: In late March 2009, Richards attempted to sell the Snow Moto to ██████████████, one of the retailers that Pedersen and Rios agreed would be "off limits" to Sport Dimension for snow bike distribution because Tech-4-Kids already had plans to sell directly to ████. (SUF ¶ 43.) On March 26, 2009, Pedersen complained to Rios that Richards had approached an "off limits" retailer. (SUF ¶ 44.) Rios apologized for the confusion stating that it "was clearly an error, we apologize and *will clarify with the buyer that this is your business.*" (emphasis added) (SUF ¶ 44.) Rios subsequently instructed Richards not to approach specified "off limits" retailers. (SUF ¶ 45.) Richards testified that ██████████████████████████ █████████████████████████████████████████████████. (SUF ¶ 45.) At Rios's instruction, Richards went back to ██████ and informed them that he could not offer the product and the product could be procured from Tech-4-Kids instead. (SUF ¶ 46.)

Price: The price at which Sport Dimension offered the Snow Moto to ████████ also demonstrates a belief on the part of Sport Dimension that it expected to procure the Snow Moto at the prices agreed upon in the March 17, 2009 email thread. Sport

8

1   Dimension had hoped to earn a ████████████ profit margin on its sales. (SUF ¶ 47.)

2   The price of ████ at which Sport Dimension offered the X-Games Snow Moto to ████████

3   was in between ████████████ assuming a purchase price of ██████ per the agreement

4   with Tech-4-Kids. (SUF ¶ 48.)  In short, Sport Dimension acted as though an agreement

5   was in place.  In fact, Lin admitted that Sport Dimension could not have offered Tech-4-

6   Kids' products to Sport Dimension's customers absent permission from Tech-4-Kids to

7   do so. (SUF ¶ 49.)

8       2.    <u>Tech-4-Kids' Subsequent Conduct Indicates Belief that Contract Had Been</u>

9             <u>Formed</u>

10  <u>Sales Support Materials Provided to Sport Dimension</u>:  As he offered to do in their

11  initial email exchange, Pedersen provided Rios and Sport Dimension with additional

12  materials meant to help Sport Dimension market and sell the Snow Motos. (SUF ¶ 50.)

13      • On March 18, 2009, Pedersen emailed Lin and Rios with further details

14        regarding shipment of samples to Sport Dimension.  Sport Dimension had

15        provided its shipping information earlier in the email chain. (SUF ¶51.)

16      • On March 27, 2009, Pedersen sent an email to Rios containing highly

17        confidential point of sale information (including the products' sell-thru rate)

18        and marketing information relating to Snow Moto sales at ████████████

19        ████████████ (SUF ¶ 51.)

20      • On March 27, 2009, Pedersen sent an email to Rios for Rios to "pass onto your

21        sales team."  Attached to the email was a power point presentation titled "Snow

22        Racers 2009" which included Tech-4-Kids' entire upcoming snow line

23        including the various Snow Moto models and the upcoming products' new

24        features. (SUF ¶ 51.)

25  Pedersen would have had no reason to communicate any of these things to Sport

26  Dimension if the parties had not reached an agreement. (SUF ¶ 52.)

27  <u>Reduced U.S. Sales Efforts</u>:  After it entered into the distribution agreement with

28  Sport Dimension, Tech-4-Kids substantially reduced its efforts to sell the Snow Moto to

9

1  U.S. retailers because it believed that Sport Dimension was pursuing those opportunities.

2  (SUF ¶ 53.).[4]  Tech-4-Kids also sent out an email to its sales representatives informing

3  them that U.S. Snow Moto sales would be handled by a third party distributor, referring

4  to Sport Dimension.  (SUF ¶ 55.)  Gary Smick, Tech-4-Kids' outside sales

5  representatives primarily for ██████████ received that email and was upset by it because

6  he understood it to mean that he would be replaced for ongoing sales efforts to ████

7  ████  Weenink later reassured Smick that, consistent with Pedersen and Rios's

8  agreement, sales efforts to ██████████ would not be handled by the distributor (Sport

9  Dimension).  (SUF ¶ 56.)

10     Pedersen's Subsequent Inquiries to Rios and Richards:  After Sport Dimension

11 accepted Tech-4-Kids' terms on March 17, Pedersen contacted Rios on a number of

12 occasions to check on the status of what he believed would be ongoing sales efforts on

13 Tech-4-Kids' behalf.  (SUF ¶¶ 57- 60.)  These interactions further demonstrate the

14 parties' mutual understanding that there was an agreement with the above terms.

15   • On April 15, 2009, Pedersen emailed Rios with some licensing information

16      from X-Games and stated "[c]ould be interesting for sharing with your ████

17      buyer.  I know you are looking at Ski Doo but we could do a different version

18      for ████ of Xgames."  (SUF ¶ 57.)  The following day, Rios responded that he

19      wanted to proceed in offering the Ski-Doo model.

20   • On May 5, 2009, Pederson wrote to Rios "[w]e are gearing up for production

21      and I wanted to check in with you on the status of the program for the year.  Let

22      me know how you are making out and when you intend to start placing orders

23      for ship dates."  (SUF ¶ 58.)  Pedersen also informed Rios that Tech-4-Kids had

24      sold the Polaris model to ██████████ for that year.  Rios responded by

25      indicating that they had some success in marketing the Ski-Doo model to ████

26      ████.  (SUF ¶ 58.)

27 ─────────────────────
28 [4] During 2009 and 2010, Tech-4-Kids only quoted pricing for the Snow Moto to two
   additional U.S. retailers.  (SUF ¶ 54.)

- On May 6, 2009 Pedersen asked Rios, "How are you making out at the other [accounts]?" Rios responded that "[p]rice has been an issue" but asked Richards to provide a more complete update. Richards responded on May 8, by telling Pedersen that he had done "presentations," which turned out to be untrue, with "several" accounts who "all noted the same thing. There is not enough margin in the item and ▮▮▮ is definitely the ceiling retail price. Most buyers commented that they liked the item." (SUF ¶ 59.)

- On July 10, 2009, Pedersen asked Rios about the status of the ▮▮▮▮ test. Rios responded "Sorry for the lack of communication, the response time from ▮▮▮▮ has been very slow as well. They only confirmed last week that they will not be going forward with a test of the snow bike." (SUF ¶ 60.)

Neither Rios nor Richards responded to Pedersen's inquiries with confusion as they might have had there been no distribution agreement. Rather, all of the above exchanges indicate a mutual understanding that Sport Dimension was to be selling Tech-4-Kids' Snow Moto product.

**D.    Sport Dimension's Breach of the Distribution Agreement**

Despite the unambiguous written understanding between the parties and subsequent conduct clearly demonstrating a meeting of the minds, Sport Dimension breached the material terms of the parties' agreement.

Disingenuous Sales Efforts: During his discussions with Pedersen, Rios declined to agree to the minimum sales quantity proposed by Pedersen. However, Rios committed that Sport Dimension would "try and sell as much as [it] can." (SUF ¶ 30.) Sport Dimension, however, failed to use its best efforts to sell the Snow Moto. During his deposition, Richards testified that his normal sales efforts include an in-person visit to the potential customer at which time he presents the potential customer with a picture or sample of the product. (SUF ¶ 61.) Richards failed to do so when he attempted to sell the Snow Moto. Instead, he made *a single call* to a limited number of retailers with whom he had relationships and made an effort that he, himself, admitted to be half-

11

hearted. (SUF ¶ 62.) He also testified that he never even saw the sample Snow Motos sent by Tech-4-Kids before he attempted to sell it. (SUF ¶ 63.) In contrast, when Sport Dimension was selling its own competing product, it provided the retailers with detailed presentation materials. (SUF ¶ 64.)

Rios's efforts were equally insincere. He offered the Snow Moto to only a single customer, ████████, and priced the product at ████. (SUF ¶ 65.) Richards admitted that Sport Dimension still could have made a profit if it had offered a lower price. (SUF ¶ 66.) Nevertheless, when Pedersen asked Rios for an update on sales, Rios stated that the retailers to whom Sport Dimension offered the product liked the product but felt "price was an issue." (SUF ¶ 67.) In the end, Sport Dimension failed to sell a single Snow Moto to any of its customers. (SUF ¶ 68.) Later, when Sport Dimension attempted to sell its own Yamaha snow bike to ████████, it offered it for the substantially lower price of ████████ less than the price at which it had offered Tech-4-Kids' product. (SUF ¶ 69.)

Unauthorized Sale to ████: As described above, Rios agreed on behalf of Sport Dimension that ████████████ would be "off limits" accounts. (SUF ¶¶ 26-29.) At no time from March 2009 to December 2009 did Rios or anyone at Sport Dimension disclose to Tech-4-Kids that Sport Dimension was contemplating developing a competing product. (SUF ¶ 70.) Of course, had Tech-4-Kids known of Sport Dimension's duplicity, it never would have allowed Sport Dimension to pass itself off as Tech-4-Kids' distributor, much less provide it with confidential and commercially sensitive information. (SUF ¶ 71.) By January 19, 2010, six months after Sport Dimension told Tech-4-Kids that not a single retailer in the United States was interested in buying its product, Sport Dimension's agent, Stallion Sport ("Stallion"), already had a competing snow bike that was "90% completed." (SUF ¶ 72.) In early 2010, Sport Dimension shipped samples to ████████, but because it was unable to brand the product in time, it did not successfully sell the Yamaha snow bike to ████████. until

*LA 130872455v1*

1 │ the 2011 season.  (SUF ¶ 63.)  Once it had a branded product for ███████ stopped

2 │ buying from Tech-4-Kids.  (SUF ¶ 74.)

### III.   ARGUMENT

#### A.   Legal Standard

5 │     A motion for summary judgment must be granted "if the movant shows that there

6 │ is no genuine dispute as to any material fact and the movant is entitled to judgment as a

7 │ matter of law." Fed. R. Civ. P. 56(a).  Facts are material if they affect the outcome of the

8 │ suit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

9 │ (1986).  "[S]ummary judgment will not lie if the dispute about a material fact is

10 │ 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for

11 │ the nonmoving party."  *Id.*  "A party seeking summary judgment bears the initial burden

12 │ of informing the court of the basis for its motion and of identifying those portions of the

13 │ record that demonstrate the absence of a genuine issue of material fact."  *Morris v.*

14 │ *Guetta*, LA CV12-00684 JAK, 2013 WL 440127, at *2 (C.D. Cal. Feb. 4, 2013) (citing

15 │ *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

16 │     "Where the moving party will have the burden of proof on an issue at trial, that

17 │ party must affirmatively demonstrate that no reasonable trier of fact could find other than

18 │ for the moving party."  *Id.* (*Celotex Corp.*, 477 U.S. at 331).  If the moving party meets

19 │ its initial burden, the nonmoving party must set forth "specific facts showing that there is

20 │ a genuine issue for trial."  *Anderson*, 477 U.S. at 250.  "Conclusory, speculative

21 │ testimony in affidavits and moving papers is insufficient to raise genuine issues of fact

22 │ and defeat summary judgment."  *Id.* (citing *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594

23 │ F.2d 730, 738 (9th Cir. 1979)).  "If the court does not grant all the relief requested by the

24 │ motion, it may enter an order stating any material fact-including an item of damages or

25 │ other relief-that is not genuinely in dispute and treating the fact as established in the

26 │ case."  Fed. R. Civ. P. 56(g).

LA 130872455v1

**B.**     **Tech-4-Kids is Entitled to Partial Summary Judgment on its Breach of Contract Claim (Third Claim for Relief)**

"The essential elements of a breach of contract claim are:  (1) the existence of a contract, (2) that plaintiffs performed or had an excuse for not performing under the contract, (3) that defendants breached the contract, and (4) that plaintiffs were damaged." *Seaman v. Pyramid Technologies, Inc.*, SACV 10-00070 DOC, 2011 WL 5508971, at *4 (C.D. Cal. Nov. 7, 2011) (citing *First Commercial Mortgage Co. v. Reece,* 89 Cal. App. 4th 731, 745 (2001)) (granting Plaintiff's motion for summary judgment of breach of contract claim when "Defendants have pointed to absolutely no factual support for their contentions opposing Plaintiff's Motion for Summary Judgment."). *Id.* at 5.

Tech-4-Kids moves for summary judgment on its breach of contract claim because there is no dispute of material fact that (1) Tech-4-Kids and Sport Dimension entered into a written distribution contract for the sale of goods in March 2009; (2) Sport Dimension breached the material terms of that agreement; and (3) as a result, Tech-4-Kids was caused damage in the form of lost sales.

1.     There is No Dispute of Material Fact that the Parties Entered Into a Distribution Agreement in March 2009

On summary judgment, a court can decide whether a contract exists as a matter of law if there are no genuine issues of material fact. *See Warehousemen's Union Local No. 206 v. Continental Can Co.*, 821 F.2d 1348, 1350 (9th Cir. 1987) (finding existence of contract on summary judgment); *Safadi v. Citibank, N.A.*, No. 12–1356 PSG, 2012 WL 4717875, at *2 (N.D. Cal. Oct. 2, 2012) (finding as a matter of law that parties entered into a binding arbitration agreement).  "When a contract is not ambiguous, summary judgment may be entered based on the court's interpretation of clear and unambiguous provisions which present only questions of law." *Travelers Cas. And Sur. Co. v. American Intern. Surplus Lines Ins. Co.*, 465 F. Supp. 2d 1005, 1012 (S.D. Cal. 2006).

"In a contract dispute, summary judgment is appropriate when the contract terms are clear and unambiguous, even if the parties disagree as to their meaning." *CEC*

*Entertainment, Inc. v. Kobra Properties*, No. 2:06-CV-00639-JAM-EFB, 2008 WL 4779567 at *2 (E.D. Cal. Oct. 27, 2008) (interpreting contract and its remedies on summary judgment as a matter of law); *U.S. v. Dahan*, 369 F. Supp. 2d 1187, 1193 (C.D. Cal. 2005) ("Since the Court has determined that the language of the contract is clear and unambiguous, interpretation of the contract is a question of law.").

"A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *See* Cal. Comm. Code § 2204(1). Here, there is no dispute of material fact that the March 2009 email exchange was a writing sufficient to show the material terms of an agreement as a matter of law. *See E. & J. Gallo Winery v. Andina Licores S.A.*, 440 F. Supp. 2d 1115, 1129 (E.D. Cal. 2006) (quoting *Westoil Terminals Co. v. Industrial Indemnity Co.*, 110 Cal. App. 4th 139, 145-146 (2003)) ("[t]he fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. Such intent is to be inferred, if possible, solely from the written provisions of the contract. If contractual language is clear and explicit, it governs.").

After discussing the particular products to be sold, the customers to whom those products would be sold and the special wholesale price that Sport Dimension would pay for those products, Rios responded, "Brad, We are good to go.  We accept your new higher prices listed below along with ███████████ for shipping.". (SUF ¶ 34.)  Rios also promised to keep Pedersen apprised of Sport Dimension's progress in selling the Snow Moto models to U.S. retailers. (SUF ¶ 35.)  Moreover, the factual record contains no evidence whatsoever that would indicate a contrary intent by the parties other than to enter into a distribution with terms as described in detail above.  Accordingly, the Court can easily determine as a matter of law that a contract exists.

While in email form, the terms of the written agreement are unambiguous on their face and the Court can therefore determine them as a matter of law. *See United Broth. of Carpenters and Joiners of America, Lathers Local 42-L v. United Broth. of Carpenters and Joiners of America*, 73 F.3d 958, 961 (9th Cir. 1996) (upholding granting Plaintiff's

15

summary judgment claim as to breach of contract because contract terms are unambiguous despite parties' disagreement as to meaning); *Waterbury v. T.G. & Y. Stores Co.*, 820 F.2d 1479, 1481 (9th Cir. 1987) (upholding summary judgment regarding breach of contract where language "specific and unambiguous.").

<u>Mutual Intent to Contract</u> – Rios repeatedly wrote that he was interested in reaching an agreement with Tech-4-Kids to distribute the Snow Moto. (*See* SUF ¶ 18, March 3, 2009 Email ("[w]e would hope that we could come to some agreement so that we could make sales calls this year before all commitments have been made); SUF ¶ 19, March 4, 2009 Email ("We would like to get started as soon as we can…"); SUF ¶ 20, March 8 Email ("We reviewed the cost sheet that you sent us and worked from Retail to a Cost or back to see if we could put some sort of deal in place or arrangement."); SUF ¶ 20 ("I look forward to us being able to speak tomorrow and hopefully put an agreement together."); SUF ¶ 21, March 10, 2009 Email ("Please see my comments to your proposal and each point below. I hope we can put a deal together.").)

Likewise, Pedersen clearly expressed his intention to enter into a binding agreement. (*See* SUF ¶ 19, March 4 Email ("As snow presentations are happening now when would you need a deal done and what would you need and when to get started? We are open to considering an opportunity but it would need to show value beyond what we could do on our own" to which Rios responded "[w]ould like to get started as soon as soon as we can."); SUF ¶ 17, March 4 Email ("Show me what you would need to buy the product for to make the numbers work" to which Rios responded on March 8 "███████ ███████"); SUF ¶ 17, March 9 Email ("I have discussed with key stake holders and we are prepared to consider moving on this deal . . . .Please let me know if you are prepared to proceed on the above basis.").)

The above mutual intent to contract culminated in an exchange of specific proposed terms with Rios stating on March 17, 2009, "Brad, We are good to go. We accept your new higher prices listed below . . . .I will update you as we progress." (SUF ¶ 35.) There is nothing in the email chain, nor is there any extrinsic evidence, that would

16

create a disputed issue of material fact but that Rios and Pedersen, on behalf of their

respective companies, intended to enter into a binding distribution agreement with one

another.

<u>Clear Offer and Acceptance</u> – The email exchange between Rios and Pedersen also

reflect the offer and acceptance of terms needed to form a contract.  After exchanging

information (mostly provided by Pedersen) relating to the snow bike business, the

intended customers, the margin to be proposed to retailers, and special wholesale pricing,

in his March 9, 2009 Email, Pedersen offered terms to Rios under specific headings

which Pedersen intended to constitute the proposed terms of an agreement.  (SUF ¶ 75.)

The following day, Rios responded with comments inserted directly into Pedersen's

email accepting or rejecting each of Pedersen's offered terms:

| Offer in Pedersen's March 9 Email | Rios's March 10 Acceptance / Counter | Final Agreement Term |
|---|---|---|
| 1. <u>Price</u>.  X-Games for ████ Ski Doo/ Polaris for ████ (SUF ¶ 22.) | Accepted. (SUF ¶ 25.) | In Pedersen's March 15, 2009 email, the proposed prices were increased to X-Games for ████ Ski Doo/ Polaris for ████ in light of Rios's rejection of minimum quantity commitment. On March 17, Rios writes "[w]e accept your new higher prices…." |
| 2. Accounts.  Will confirm Costco the following day but specifies "other accts off limits are ████" Pedersen clarifies that due to Tech-4-Kids ongoing sales to ████, "we believe better to keep this acct in house." (March 10 Email.) (SUF ¶¶ 26, 28.) | Accepted. Identified "off limits" retailers as specifically including ████. (SUF ¶ 26.) | In a later email (11:19 PM) on March 10, Pedersen states, "your list [of accounts] is correct except as it stands now we will also handle ████." Thus, Pedersen indicates to Rios that ████ is off limits as well.  On March 17, Rios accepts: "Brad, we are good to go." (SUF ¶ 29.) |
| 3. <u>Costs</u>.  Sport Dimension | Accepted. (SUF ¶ | |

| | | |
|---|---|---|
| will be responsible for all costs associated with servicing accounts. (SUF ¶ 17 at SDI 001243.) | 17 at SDI 001243.) | |
| 4. <u>Opportunity (Quantity)</u>. Minimum commitment of █████ in sales from Sport Dimension. (SUF ¶ 30.) | Rejected. Instead, Rios states "We will try to sell as much as we can." (SUF ¶ 30.) | In his March 15 email, Pedersen accepts Rios's counteroffer to sell "as much as [Sport Dimension] can" on the condition that Rios accepts higher pricing (*See* No. 1.) On March 17, Rios accepts "the new higher prices." |
| 5. <u>Orders</u>. Tech-4-Kids would require a █████ deposit due on every order. (SUF ¶ 17 at SDI 001243-44.) | Rejected. Counteroffers with a letter of credit to be provided instead. (SUF ¶ 17 at SDI 001244.) | In his March 10 email, Pedersen rejects the counteroffer and states that Tech-4-Kids has "no flexibility on the L/C vs deposit." On March 17, Rios accepts: "Brad, we are good to go." |

As the above demonstrates, by March 17, 2009, the material terms of a contract were clear.

     <u>Consideration</u>.  The above deal terms reflect a bargain for the exchange of adequate consideration needed to form an agreement. *Gallagher v. Holt*, 2:08-CV-03071 JFM C, 2012 WL 3205175, at *10 (E.D. Cal. Aug. 3, 2012) (the "price agreed to be paid" is either a benefit conferred on the defendants or a prejudice suffered by the plaintiffs). Sport Dimension would use its best efforts to sell as much as it could in order to gain additional U.S. market share for the Snow Moto.  In return, Tech-4-Kids would sell the Snow Moto products to Sport Dimension at a special wholesale price that would allow Sport Dimension to make a profit while still selling to retailers at the desired price points █████ for club retailers, █████ for mass retailers and █████ for sporting goods retailers).  (*See* SUF ¶ 47, Rios's March 5 email ("We would like to try to get █████ domestic margin to cover the cost of doing business with USA distributors . . . For FOB or direct programs, we can work between █████").)  Tech-4-Kids also provided Sport Dimension with marketing information to assist with sales.  (SUF ¶ 50.)  There is no

1  disputed issue of material fact that the parties bargained for consideration needed to form

2  a binding agreement.

3       The parties' subsequent conduct only further demonstrates the lack of a disputed

4  issue regarding the existence of a distribution agreement. *See also Investment Service*

5  *Co. v. Roper*, 588 F.2d 764, 767 (9th Cir. 1978) (reversing district court decision for

6  failure to determine whether implied contract formed through parties' conduct); *Hua v.*

7  *MEMC Electronic Materials, Inc.*, No. C 09-555 JF (RS), 2009 WL 1363545, at *6 (N.D.

8  Cal. May 14, 2009) (determining contract formed on summary judgment by conduct

9  where letter indicated manufacturing of goods would begin); *Apex LLC v. Sharing World,*

10 *Inc.*, 206 Cal. App. 4th 999, 1011 (2012) (reversing trial court's determination of lack of

11 mutual assent because "parties engaged in conduct recognizing the existence of the

12 contracts" including shipping of goods).

13      First, almost immediately, on March 27, 2009, Sport Dimension prepared a ████

14 ████████ with pricing for the Ski-Doo brand Snow Moto. (SUF ¶ 38.) Rios

15 attached the Quote Sheet to an email that he sent to ████████ in 2009 in which

16 he wrote: "Please see the quote sheet for the Ski-Doo snow bike. . . . As a vendor we are

17 always being tasked with bringing ████ new exciting items, this is one of those." (SUF

18 ¶¶ 40, 41.) Similarly, although falling well short of his usual sales efforts, Richards

19 presented the Snow Moto to several of his accounts as well. (SUF ¶ 39.) Rios and

20 Richards would have had no reason, and in fact, no authorization, to offer Tech-4-Kids'

21 products unless there was an agreement that obligated them to do so or provided them

22 with guaranteed access to the product that they were selling. (SUF ¶ 52.)

23      Second, the price at which Rios offered the Snow Moto also indicates his belief

24 that he could procure the Ski-Doo for the ████ price that he accepted on March 17. In

25 his March 4 email, he told Pedersen that Sport Dimension hoped to earn profit margins of

26 ████ ████████ ████████ for product sold FOB China, as would be the ████████

27 sales. (SUF ¶ 47.) The quote sheet presented to ████████ indicates that Rios offered a

28 price of ████ for the Ski-Doo which would be just within ████ profit margin

1  assuming an underlying purchase price of █████.  Sport Dimension could not have

2  offered a price of ██████ and met its profitability goals unless it had reached an

3  agreement to purchase the Ski-Doo at the ██████ wholesale price that Pedersen offered

4  and Rios accepted on March 17.

5      Third, at least at first, Sport Dimension attempted to abide by its agreement to only

6  seek new U.S. customers for the Snow Moto.  Rios apologized when Richards offered the

7  Snow Moto to ████, a Tech-4-Kids customer.  (SUF ¶ 44.)  Consistent with the parties'

8  understanding, Richards went back to ████ and informed them that he should not have

9  offered the product to them and they could procure the Snow Moto directly from Tech-4-

10 Kids.  (SUF ¶ 46.)  Richards testified that ████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████.  (SUF ¶ 45.)

13     Fourth, at least initially, Sport Dimension only approached retailers not on the "off

14 limits" list.  In his very first email to Pedersen, Rios indicated that Sport Dimension had

15 relationships with "major retailers like ████████████████████████"

16 (SUF ¶ 17 at SDI 001247.)  ████████████████ were identified Tech-4-Kids

17 customers and agreed to be "off limits."  (SUF ¶ 26.)  As such, Sport Dimension initially

18 approached only ██████████ and several other retailers not on the "off limits" list.  (SUF

19 ¶ 39.)  Presumably, Sport Dimension would have attempted to offer the product to those

20 additional accounts like ██████████████ if Rios and Richards understood that they

21 were free to do so.

22     Fifth, Pedersen's multiple inquiries as to how sales efforts were proceeding and

23 Rios and Richards' responses to those inquiries demonstrate the parties' understanding

24 that there was a distribution agreement in place.  (SUF ¶¶ 57-60.)  Otherwise, Rios and

25 Richards would have responded with confusion as opposed to providing Pedersen with

26 sales updates and product feedback.

27     Finally, Tech-4-Kids completely reduced its sales efforts directed at new U.S.

28 retailers for the 2009 and 2010 sales seasons until it became apparent that Sport

20

1  Dimension was not performing under the agreement by distributing Tech-4-Kids'

2  product.  (SUF ¶ 53.)

3      In short, both the plain terms of the agreement between Rios and Pedersen, as well

4  as the parties' subsequent conduct, demonstrate that there is no legitimate dispute of

5  material fact as to the existence of an agreement between Tech-4-Kids and Sport

6  Dimension.

7      2.      <u>There is No Dispute of Material Fact That Plaintiffs Performed or Had an</u>

8              <u>Excuse for Not Performing Under the Contract</u>

9      The element of Tech-4-Kids' performance is not at issue.  Tech-4-Kids always

10 remained willing and able to provide the product to Sport Dimension under the agreed

11 upon terms.  Indeed, on May 5, 2009, Pedersen even reached out to Rios to ensure that

12 expected Sport Dimension orders were factored into Tech-4-Kids' production.  (SUF ¶

13 58.)

14     3.      <u>There is No Dispute of Material Fact that Sport Dimension Breached its</u>

15             <u>Agreement</u>

16     Despite Rios's commitment to "try and sell as much as we can," Sport Dimension

17 ultimately failed to sell a single unit of the Snow Moto.  Had Rios indicated that he

18 would not use best efforts to sell Tech-4-Kids' product or that Sport Dimension was

19 contemplating developing a competing product, Pedersen would never have entered into

20 the agreement in the first place nor provided Sport Dimension with the information it

21 later used to enter the category.

22     *a.      **Sport Dimension failed to make commercially reasonable efforts in***

23             ***2009***

24     A court can determine at the summary judgment stage that a defendant breached a

25 contract by its failure to make commercially reasonable efforts to satisfy a contractual

26 obligation.  Although the question of "[w]hether a defendant used best efforts under the

27 circumstances is a factual question usually reserved for the jury, [a party] may still

28 prevail on this motion, however, if the relevant facts are undisputed and conclusive."  *See*

21

*Samica Enterprises, LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712, 717 (C.D. Cal. 2008) (citing *Celotex Corp.*, 477 U.S. at 325) (no disputed factual issue as to question of whether efforts were reasonable); *see also Hershey Foods Corp. v. Collegiate Marketing, Inc.*, Case No. 95 Civ. 10526(SAS), 1997 WL 772768, at *4 (S.D.N.Y. Dec. 15, 1997) (granting summary judgment in plaintiff's favor on finding that there  was no disputed issue of material fact that defendant breached contractual obligation to use "best efforts" to distribute products).

There is no dispute of material fact that Sport Dimension failed to use reasonable efforts to sell Tech-4-Kids' product despite Rios's promise to do so.

First, Todd Richards, Sport Dimension's Vice-President of Sales, claims to have offered the X-Games Snow Moto product to several of his accounts including █████ ██████████████████████████████████████. (SUF ¶ 39.)  Richards testified that under normal circumstances, when he pitches a product he "would be face-to-face with a buyer doing a presentation of product or products that [are] available for that account." (SUF ¶ 61.)  Richards takes that approach because he "regard[s] that as how to do a proper presentation." (SUF ¶ 61.)  Here, however, Richards placed only a single phone call to five accounts, never conducted any follow-up, and failed even to present the buyers that he contacted with a picture or sample of the product that he was selling even though samples had been shipped by Tech-4-Kids to Sport Dimension.  (SUF ¶ 62.) Richards never followed up with any of the buyers to attempt to generate interest in the product.  (SUF ¶ 62.)  Richards also failed even to present the buyers with any quote sheets or other materials that might have prompted a sale.  (SUF ¶ 62.)

Moreover, immediately after Rios and Pedersen executed the agreement, Tech-4-Kids shipped a number of samples of the X-Games and Ski-Doo models to Sport Dimension for use in selling those products.  (SUF ¶ 51.)  Yet, Richards did not even see the samples before he attempted to sell the product to his accounts and testified that he only saw a picture of the product.  (SUF ¶ 63.)  It is difficult to imagine how Richards could have done his best to sell a product that he never even saw.

1   Finally, Sport Dimension failed to adjust its price in order to try to win business.

2   Richards offered the X-Games product to his accounts with a ████ markup above the

3   purchase price from Tech-4-Kids. (SUF ¶48.)  Yet, all of the accounts stated that,

4   although "they liked the item," "price has been an issue" and "[t]here is not enough

5   margin in the item."  (SUF ¶ 59.)  Richards testified ██████████████████████

6   ████████████████████████████████████████████. (SUF ¶ 66.)

7   Indeed, when Sport Dimension sold the Yamaha to ██████████ in early 2011, it did so at

8   a price that would have earned Sport Dimension significantly less than a ████████ profit

9   margin.  (SUF ¶ 76.) He also testified that ████████████████████████

10  ████████████████████████████████████. Ultimately, however,

11  Richards did not reduce pricing, Rios did not discuss a price concession with Tech-4-

12  Kids and Sport Dimension made no further effort to sell the product for the 2009 season.

13  What Sport Dimension did, instead, was to begin developing its own competing

14  snow bike product which Rios claims began in November 2009.  (SUF ¶ 77.)  Incredibly,

15  to months later, in January 2010, Sport Dimension's model snow bike was already 90%

16  done.  (SUF ¶ 72.)  By February 2010, less than a year after Rios had entered into a

17  distribution agreement with Pedersen, Sport Dimension, offered a competing snow bike

18  to ██████████. (SUF ¶ 78.)  Sport Dimension's development of its own product is

19  further proof of its failure to take reasonable efforts to sell Tech-4-Kids' Snow Moto as

20  Sport Dimension was contractually obligated to do.

   ***b.     Sport Dimension failed to make any efforts to sell the product after***
   ***2009***

23  Sales and distribution agreements such as the one entered into by Sport Dimension

24  and Tech-4-Kids usually last for a term longer than a single season.  (SUF ¶ 31.)  Cal.

25  Comm. Code § 2202(a) (final writing may be explained by "usage of trade").  The

26  undisputed factual record makes clear that the distribution agreement between Tech-4-

27  Kids and Sport Dimension was no different.  Rios provided the clearest indication of the

28  parties' understanding to that effect.  In July 2009, after Rios informed Pedersen that

1   █████████  had opted not to test the product, he stated, "Sorry this did not work out

2   better for both of us, this is a good item, and **maybe with a better retail climate we will**

3   **have better luck next year**." (emphasis added)  (SUF ¶ 42.)

4       Yet, the record is undisputed that Sport Dimension made absolutely no effort to

5   sell Tech-4-Kids' product for the 2010 snow season, but instead began offering its own

6   product to █████████ and pursuing Yamaha for a license in February 2010.  (SUF ¶

7   79.)  By early 2011, Sport Dimension had obtained a Yamaha license for its snow bike

8   and was offering it to ███████████, as well as other retailers.  (SUF ¶ 73.)

9   Because Sport Dimension admits it made only minimal efforts to sell Tech-4-Kids'

10  products in 2009 and made no efforts at all to sell Tech-4-Kids' products after 2009, it is

11  undisputed that it breached its agreement to sell as many products as possible.

12      *c.*    **Sales to** ████

13      The parties were clear that the purpose of the agreement was to avoid interfering

14  with Tech-4-Kids' ongoing sales while allowing it to increase its exposure to new U.S.

15  retailers.  (SUF ¶ 16.)  Sport Dimension agreed not to approach ███████████

16  ████ because doing so would interfere with Tech-4-Kids' ongoing sales efforts with both

17  entities.  (SUF ¶ 29.)  Pedersen made clear that he would reject any deal that permitted

18  Sport Dimension to interfere with Tech-4-Kids' existing sales efforts.  (SUF ¶ 16.)

19      Despite the parties' clear understanding, ten months after agreeing to distribute

20  Tech-4-Kids' snow bike, in January 2010, Sport Dimension offered to sell ████

21  ████ a snow bike designed by its agent Stallion.  (SUF ¶ 78.)  On February 14, 2011,

22  Sport Dimension offered its new snow bike branded under the Yamaha license, almost

23  identical to the Snow Moto, to both █████████████.  (SUF ¶ 73.)

24  Despite its highly successful sale of more than ████ units of the Snow Moto Polaris in

25  2010, in 2011 ██████. abruptly dropped the Tech-4-Kids' product in favor of the

26  newly developed and virtually identical Sport Dimension product.  (SUF ¶ 74.)

27

28

24

4.    <u>There is No Dispute of Material Fact that Tech-4-Kids Was Damaged</u>

The fact of damage is undisputed.  Tech-4-Kids lost U.S. sales opportunities in 2009 and 2010 because it relied on Sport Dimension to make those sales.  (SUF ¶ 80.)  It is undisputed that Tech-4-Kids did not approach ███████, or any of the sporting goods retailers that Tech-4-Kids believes Sport Dimension had relationships with.  (SUF ¶ 54.)  It is also undisputed that Tech-4-Kids lost the ███████ business to Sport Dimension in early 2011.  (SUF ¶ 81.)  There is no disputed issue of material fact that (a) the parties had an agreement; (b) Sport Dimension breached the agreement; and (c) Tech-4-Kids was damaged.  Thus, liability can be established as a matter of law. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – *or the part of each claim or defense* – on which summary judgment is sought.") (emphasis added); Fed. R. Civ. P. 56(g) (If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case."); *Liang v. Cal-Bay Intern., Inc.*, No. 06cv1082–WMc, 2012 WL 1282984, at *1 (S.D. Cal. Apr. 13, 2012) (granting plaintiff summary judgment as to breach of contract and ordering subsequent calculation of damages); Schwarzer et al., Federal Civil Procedure Before Trial (Rutter 2013) §14:36, p. 14-13 ("These provisions make clear that summary judgment may be requested as to any *issue*.") (emphasis in original).  As for the amount of damages, that is an issue best left to the trier of fact at the time of trial.  (SUF ¶ 82.)

DATED:  May 3, 2013            **GREENBERG TRAURIG, LLP**

By:    /s/ *Valerie W. Ho*
Valerie W. Ho
Michael S. Lawrence
Robert S. Freund
Attorneys for Plaintiff and
Counter-Defendant Tech-4-Kids, Inc.

25