**GREENBERG TRAURIG, LLP**
Valerie W. Ho (SBN 200505)
(hov@gtlaw.com)
Michael S. Lawrence (SBN 255897)
(lawrencem@gtlaw.com)
Robert S. Freund (SBN 287566)
(freundr@gtlaw.com)
1840 Century Park East, Suite 1900
Los Angeles, California  90067
Telephone: (310) 586-7700
Facsimile: (310) 586-7800

Attorneys for Plaintiff
Tech-4-Kids, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| TECH-4-KIDS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SPORT DIMENSION, INC., <br><br> Defendant. | CASE NO. 2:12-CV-06769-PA-AJW <br><br> **[REDACTED] PLAINTIFF TECH-4-KIDS, INC.'S OPPOSITION TO SPORT DIMENSION INC.'S MOTION FOR SUMMARY JUDGMENT** <br><br> [Separate Statement of Genuine Issues, Evidentiary Objections, Declarations of Michael Lawrence, Brad Pedersen and Thomas Neches Filed Concurrently herewith] |
| SPORT DIMENSION, INC., <br><br> Counterclaimant, <br><br> vs. <br><br> TECH-4-KIDS, INC., <br><br> Counterdefendant. | DATE:        June 3, 2013 <br> TIME:        1:30 p.m. <br> CTRM:        15 <br><br> **Judge: Honorable Percy Anderson** |

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  STATEMENT OF FACTS ................................................................................ 1

    A.  The Parties ................................................................................................ 1

    B.  The Parties Enter Into a Distribution Agreement .................................. 2

        1.  Material Terms of the Parties' Distribution Agreement ................ 2

        2.  Subsequent Conduct Consistent with Distribution Agreement ......... 4

    C.  SD's Breach of the Distribution Agreement ........................................... 6

    D.  Pedersen Provides Proprietary Trade Secret Information to Rios ................ 7

    E.  SD Uses the Information It Obtained Under the Guise of a Distribution
        Relationship to Enter the Market ............................................................. 8

    F.  SD's Fraud ................................................................................................. 9

III.  ARGUMENT ................................................................................................... 10

    A.  Disputed Issues of Material Fact Preclude Summary Judgment of T4K's
        Trade Secret Misappropriation Claim ................................................... 10

        1.  T4K's Confidential Information Qualifies as Trade Secrets ........... 10

        2.  T4K Took Reasonable Efforts to Protect its Trade Secrets ............. 13

        3.  SD Used T4K's Proprietary Information ......................................... 15

    B.  Disputed Issues of Material Fact Preclude Summary Judgment of T4K's
        Fraud Claims ........................................................................................... 16

        1.  SD Made False Representations and Omissions of Material Facts . 16

        2.  Whether SD Had Fraudulent Intent is an Inherently Factual
        Question ............................................................................................. 18

LA 130878396v12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    3.     T4K Relied on SD's Misrepresentations and Omissions.................. 19

C.    Factual Issues Preclude Summary Judgment of T4K's Tortious Interference Claim ........................................................................................ 20

D.    The Parties Formed a Distribution Agreement and SD Breached It ........... 21

    1.     The Statute of Frauds Does Not Apply Here ................................... 21

    2.     The Failure to Execute an MOU is Not Fatal to the Contract ......... 22

    3.     There Was a Meeting of the Minds and SD Provided Value........... 23

    4.     There is Substantial Evidence of Breach ........................................ 24

E.    Tech-4-Kids Was Damaged....................................................................... 25

LA 130878396v12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Federal Cases**

*Am. Gen. Life Ins. Co. v. Fernandez*
    2012 WL 5267703 (C.D. Cal. Oct. 24, 2012)..........................................................20

*AMC Tech., LLC v. Cisco Sys., Inc.*
    2012 WL 174949 (N.D. Cal. Jan. 20, 2012)..........................................................18

*Aqua-Lung Am., Inc. v. Am. Underwater Products, Inc.*
    709 F. Supp. 2d 773 (N.D. Cal. 2010)..........................................................15

*BioResource, Inc. v. U.S. PharmaCo Distribution, Ltd.*
    2010 WL 3853025 (N.D. Cal. Sept. 29, 2010)..........................................................20

*Burten v. Milton Bradley Co.*
    763 F.2d 461 (1st Cir. 1985)..........................................................14

*Clark v. Bunker*
    453 F.2d 1006 (9th Cir. 1972)..........................................................13

*Diodem, LLC v. Lumenis Inc.*
    2005 WL 6220720 (C.D. Cal. Sept. 16, 2005)..........................................................13

*E. & J. Gallo Winery v. Andina Licores S.A.*
    440 F. Supp. 2d 1115 (E.D. Cal. 2006)..........................................................23

*Fields v. QSP, Inc.*
    2012 WL 2049528 (C.D. Cal. June 4, 2012)..........................................................10

*Gallagher v. Holt*
    2012 WL 3205175 (E.D. Cal. Aug. 3, 2012)..........................................................24

*Gartner, Inc. v. Parikh*
    2008 WL 4601025 (C.D. Cal. Oct. 14, 2008)..........................................................20

*Hilderman v. Enea TekSci, Inc.*
    551 F. Supp. 2d 1183 (S.D. Cal. 2008)..........................................................12

*In re Electronic Arts, Inc.*
    298 Fed. App'x 568 (9th Cir. 2008) .......................................................11, 13

*Lifetouch Nat. Sch. Studios, Inc. v. Moss-Williams*
    2011 WL 3759940 (N.D. Cal. Aug. 25, 2011) ...........................................12

*Mattel, Inc. v. MGA Entm't, Inc.*
    2011 WL 3420571 (C.D. Cal. Aug. 4, 2011)..............................................13

*MMCA Grp., LTD v. Hewlett-Packard Co.*
    2010 WL 147937 (N.D. Cal. Jan. 12, 2010) ...............................................15

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*
    267 F. Supp. 726 (S.D. Cal. 1966)..............................................................14

*Patriot Rail Corp. v. Sierra R. Co.*
    2011 WL 318400 (E.D. Cal., Feb. 1, 2011)................................................19

*Robert Half Int'l, Inc. v. Murray*
    2008 WL 2625857 (E.D. Cal. June 25, 2008) ............................................12

*SkinMedica, Inc. v. Histogen Inc.*
    869 F. Supp. 2d 1176 (S.D. Cal. 2012)........................................................13

*Steinberg Moorad & Dunn, Inc. v. Dunn*
    136 Fed. Appx. 6 (9th Cir. Cal. 2005) ........................................................12

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*
    739 F.2d 1434 (9th Cir. 1984).....................................................................18

*Waterbury v. T.G. & Y. Stores Co.*
    820 F.2d 1479 (9th Cir. 1987).....................................................................23

iv

**State Cases**

*Apablasa v. Merritt & Co.*
     176 Cal. App. 2d 719 (1959)...................................................................22

*Banner Entm't, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348
     (1998) ..........................................................................................22

*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club,*
     *Inc.*
     109 Cal. App. 4th 944 (2003) ..........................................................24

*In re Providian Credit Card Cases*
     96 Cal. App. 4th 292 (2002) ........................................................ 10, 13

*Jeffrey Kavin, Inc. v. Frye*
     204 Cal. App. 4th 35 (2012) ..............................................................22

*McCaskey v. Cal. State Auto Ass'n*
     189 Cal. App. 4th 947 (2010) ............................................................23

*San Jose Const., Inc. v. S.B.C.C., Inc.*
     155 Cal. App. 4th 1528 (2007) ..........................................................11

*Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*
     36 Cal. 3d 752 (1984).......................................................................24

*Sterling v. Taylor*
     40 Cal. 4th 757 (2007) ......................................................................22

*Thompson v. Impaxx, Inc.*
     113 Cal. App. 4th 1425 (2003) ..........................................................11

*Tri-Growth Ctr. City, Ltd. v. Silldorf, Burdman, Duignan & Eisenberg*
     216 Cal. App. 3d 1139 (1989).............................................................20

LA 130878396v12

*White Lighting Co. v. Wolfson*
        68 Cal. 2d 336 (1968)..................................................................... 21

**State Statutes**

California Civil Code, Section 1624(a).......................................................... 22

California Commercial Code, Section 2204(1)...................................... 22, 23

California Commercial Code, Section 2306(1)...................................... 23, 24

**Other Authorities**

1 Witkin Sum. Cal. Law Contracts § 365)................................................... 21

Model Civil Jury Instructions for the Ninth Circuit, No. 2.8............................ 19

LA 130878396v12

## I.    INTRODUCTION

This case is not about fair competition, as Defendant Sport Dimension, Inc. ("SD") falsely contends.  To the contrary, it is about SD's predatory acts which took advantage of a then small unsuspecting company that had hit a home run with an award-winning product.  SD pretended to be a distributor interested in selling Plaintiff Tech-4-Kids, Inc.'s ("T4K") pioneering snow bikes, the Snow Moto, in the U.S.  Under the guise of that distributor relationship, SD (a) used T4K's sample products to test market interest; and (b) extracted product, margin, cost, special wholesale pricing, point of sale data, and marketing information from T4K – all of the information it admits it needed to enter the market.  In the end, SD failed to perform under the agreement and did not sell a single T4K snow bike in the U.S.  It did, however, succeed in selling its own snow bike.  In the process, it successfully targeted one of T4K's most important U.S. customers, ███████ (a company SD had agreed was to be T4K's account) by undercutting T4K's pricing.  As explained below and in T4K's motion for partial summary judgment, partial summary judgment should be granted in T4K's favor on the contract claim, and summary judgment should be denied on all other claims as they are supported by ample evidence raising genuine issues for trial.

## II.    STATEMENT OF FACTS

### A.    The Parties

Plaintiff T4K manufactures the "Snow Moto," which is the first snow sled of its kind.[1]  It features three small skis on the bottom and a body modeled after, and licensed under, full sized motorized snow mobile brands such as Ski-Doo, Polaris, and X-Games. (Statement of Genuine Issues ("SGI") ¶ 121.) ███████████████████ █████████████████████████████████████ (SGI ¶ 123.)  In 2009, ███████ successfully test sold the Snow Moto.  (SGI ¶ 125.)  Given the successful test sale, the following year, in early 2010, ███████

---

[1] The Snow Moto is patented under U.S. Patent No. US D647,427 S.  (SGI ¶ 199.)

1

1  initially purchased ███ Snow Moto units and then ordered an additional

2  approximately ██ units to meet unexpectedly high demand as the Snow Moto would

3  have sold out long before the peak Christmas season.[2]  (SGI ¶ 127.)

4        Defendant SD is primarily a distributor of water sports products, such as wetsuits

5  and floatation devices.  SD is owned by Joseph Lin ("Lin").  (SGI ¶ 259.)  Defendant

6  Kurt Rios ("Rios") is President of SD.  (SGI ¶ 8.)[3]  Prior to being introduced to T4K's

7  Snow Moto, SD never had a snow bike product in its line-up.  (SGI ¶ 12.)

8        **B.**   **The Parties Enter Into a Distribution Agreement**

9        On Friday February 27, 2009, SD President Kurt Rios ("Rios") contacted T4K

10  President Brad Pedersen ("Pedersen") about entering into a possible business

11  relationship.  (SGI ¶ 132.)  At first, Pedersen was wary of SD's overture because of its

12  reputation in the industry for predatory business practices.  (SGI ¶ 133.)  During that

13  initial call, Rios reassured Pedersen that SD was an honorable company that was

14  genuinely interested in distributing T4K's Snow Motos.  (SGI ¶ 260.)  Given Rios's

15  reassurances and Pedersen's prior working relationship with SD's Vice President of

16  Sales, Todd Richards, Pedersen's concerns were put at ease.  (SGI ¶ 261.)

17           1.   Material Terms of the Parties' Distribution Agreement

18        The following Monday, March 3, 2009, Rios sent an email to Pedersen with the

19  subject line "USA Distribution."  (SGI ¶ 265.)  Rios wrote that he had seen T4K's snow

20  bike at a ████████████████████ and was interested in

21

22

23

_____

24  [2] An understanding of the sales cycle for winter merchandise is relevant to this Motion.

25  Manufacturers generally schedule their product pitches to retailers in December through May
   for the next snow season.  Winter products are typically shipped to retailers around August and

26  the merchandise is generally shelved in September for the upcoming winter season.  (SGI ¶
   151.)

27  [3] Sport Dimension is closely related to, and believed to be an alter-ego of Stallion Sport Ltd., a

28  Hong Kong company owned by Joseph Lin's brother.  (SGI ¶ 129.)

becoming T4K's U.S. distributor of the Snow Moto.[4] (SGI ¶ 262.)  It would be the first
of many times during the ensuing two-week email exchange that Rios expressed interest
in distributing the Snow Moto for T4K. (SGI ¶¶ 135-139 .)  Pedersen responded to
Rios's initial email by informing him that if T4K "were to consider this, [T4K's] current
[account] base would be off limits unless there was some compelling reason to consider
otherwise.  The value add for us is getting better penetration into the US market beyond
what we have been able to achieve." (SGI ¶ 134.)  After a two week negotiation, the
parties reached agreement on March 17, 2009.  Among the terms discussed and
ultimately agreed upon were the following:

- Price – After Rios rejected Pedersen's request for a minimum quantity purchase of
  ███████ offering instead that SD would sell as many products as possible,
  Pedersen increased the special wholesale price he was offering to ████ for the X-
  Games Snow Moto and ████ for the Ski-Doo and Polaris models. (SGI ¶ 24.)  On
  March 9, Pedersen also wrote, "Assuming we get there [i.e., reach agreement], before
  the end of the week, we can arrange some samples to be sent to you."  (SGI ¶ 140.)
  On March 17, 2009, Rios accepted the higher pricing along with a ████ fee for
  shipping samples.  (SGI ¶ 143-144.)  To date, these prices are the lowest Snow Moto
  prices that T4K has extended to any buyer.  (SGI ¶ 156).

- Accounts – On March 10, Rios confirmed that ████████
  ████████ would be off limits to SD.  Later that same day,
  Pedersen corrected Rios's attempt to include only ████████ stating "your list of
  accounts is correct except as it stands now we will also handle ████████
  ████████ (SGI ¶ 148.)

- Quantity –On March 10, Rios rejected Pedersen's proposal of a minimum purchase of
  ████████ but commits to "try and sell as much as we can." (SGI ¶ 149.)

---

[4] By 2009, T4K had already experienced substantial success in selling its snow bike products in
Canada, due in part to its existing relationship with ████████. T4K also
successfully sold its snow bikes to ████████. (SGI ¶ 151.)

LA 130886696v1

- <u>Term</u> – The email exchange did not include any discussion of duration. However, multi-year distribution relationships are standard in the industry. (SGI ¶ 150.) In fact, when Rios told Pedersen in July 2009 that the ▇▇▇▇▇▇ sale had not gone through, he stated, "Sorry this did not work out better for both of us, this is a good item, and ***maybe with a better retail climate we will have better luck next year***," thus confirming to Pedersen that the distribution agreement would continue into the 2010 sales season. (SGI ¶ 160 (emphasis added).)

- <u>Sales Support</u> – Pedersen also offered to make marketing information available to assist SD in its distribution efforts. (SGI ¶ 152 ("for key presentations we can make available our marketing manager to assist with sales data.").) Rios accepted: "Thanks and appreciated, any support to help us become the experts in your category of products would be appreciated. In closing we see this as a great opportunity to help get more exposure for your product in the market." (SGI ¶ 152.)

On March 17, 2009, after all of the above issues were discussed and resolved, Rios wrote: "***Brad, We are good to go. We accept your new higher prices listed below along with*** ▇▇▇▇ ***service fee for shipping***." (Emphasis added). (SGI ¶ 153.) Rios also stated "I will up date [sic] you as we progress." (SGI ¶ 154.) Pedersen responded a few hours later that he was "[g]lad to move forward." (SGI ¶ 155.)

        2.   <u>Subsequent Conduct Consistent with Distribution Agreement</u>

During the parties' negotiation, Rios indicated that once the parties entered into an agreement, SD "***could make sales calls this year before all commitments have been made***." (SGI ¶ 136 (emphasis added)). Although the parties never executed a formal MOU, the email exchange between Rios and Pedersen confirmed all of the agreed terms and both parties proceeded accordingly. Distribution deals are regularly entered into over email. (SGI ¶ 200). Rios also testified that SD's current agreement to distribute a product for another company is not memorialized in writing nor is there even an understanding regarding the duration of the agreement. (SGI ¶ 201).

<u>SD Efforts to Sell</u>. In late March and the first week of April, SD began

4

communicating with retailers regarding the Snow Moto, as Rios said they would once an agreement was reached. (SGI ¶ 263.) Richards attempted, insincerely, to sell the Snow Moto to several retailers including ███████████████████████████████. (SGI ¶ 264.) On April 2, Rios sent an email to ████████████ with a price quote for the Ski Doo Snow Moto. (SGI ¶ 158.)[5] SD offered the Snow Moto ██████████ which was the desired ████████ percent mark-up to the special wholesale price of ████████ agreed upon with T4K. (SGI ¶¶ 165.) While SD contends now that the agreed pricing was only "for samples," it actually relied on this agreed wholesale pricing to set the price at which it offered to sell hundreds of units to ████████. Indeed, SD could not have attempted to sell the Snow Moto to anyone if it did not have a deal in place with T4K permitting it to be its distributor. (SGI ¶ 166.)

The Off Limits Retailers List. SD also abided by the "off limits" list, at least initially. On March 26, 2009, Pedersen complained to Rios that Richards had offered the Snow Moto to ████, an "off limits" account. (SGI ¶ 162.) Rios responded that it "was clearly an error, we apologize and will clarify with the buyer that this is your business." (SGI ¶ 162.) Richards was informed that Rios had agreed with T4K not to approach certain retailers including ████, and at Rios's instruction, Richards told ████ of the error. (SGI ¶ 163.) After that, SD did not try to sell to any of the agreed "off limits" accounts, that is, until it came out with its own product less than a year later. (SGI ¶ 201).

T4K's Reduced U.S. Sales Efforts. Believing that SD was marketing its products in the U.S., T4K substantially reduced its efforts to sell the Snow Moto to U.S. retailers. (SGI ¶ 170.). Through 2009 and 2010, T4K almost exclusively marketed the Snow Moto to those retailers designated as T4K actual or prospective customers in the Pedersen-Rios

---

[5] In his email, he proposed that ████████ sell the product in its "top 100 snow clubs between Thanksgiving and Christmas." (SGI ¶ 159.) Rios told to Pedersen in July 2009 that he heard back from ████ and that ████ declined to proceed with the proposed test sale. (SGI ¶ 160.)

1  email.[6] (SGI ¶ 203.)  T4K also informed its outside U.S. sales representatives that Snow

2  Moto sales would be handled by a U.S. distributor except for certain specified retailers

3  such as ██████████ (SGI ¶ 172.)[7]  T4K would have continued pursuing opportunities

4  with other U.S. retailers had it not entered into an agreement with SD.  (SGI ¶ 266).

5  ### C.    SD's Breach of the Distribution Agreement

6      First, despite Rios's commitment to "try and sell as much as we can," SD did not

7  do so.  (SGI ¶¶ 149, 185.)  Although Richards's normal sales efforts include an in-person

8  visit to the potential customer and presentation of pictures or actual samples, he did not

9  do so with the Snow Moto.  (SGI ¶ 179.)  Instead, he made *a single call* to a limited

10  number of retailers with whom he had relationships exerting an effort that he, himself,

11  admitted to be half-hearted.  (SGI ¶ 179.)  Although T4K shipped samples to SD in late

12  March, Richards did not see or use the samples even though Lin admitted the samples

13  were supposed to be used by Richards and Rios in their sales efforts with customers.

14  (SGI ¶ 267.)  Rios's efforts were equally insincere.  He offered the Snow Moto to only a

15  single customer ████████, and priced the product at ████.  (SGI ¶ 182.)  In the end,

16  SD failed to sell a single Snow Moto to any of its customers.  (SGI ¶ 183.)  Despite

17  Rios's explanation that "price was an issue," SD opted not to lower the price even though

18  it admits it could have done so and still made a profit based on the pricing from T4K.

19  (SGI ¶ 183.)  Later, when SD attempted to sell its own Yamaha snow bike to ████████,

20  it offered it for the substantially lower price of ████████ less than the price at which

21  it had offered T4K's product.  (SGI ¶ 186.)

22  _____

23  [6] In fact, Evert Weenink, T4K's Director of North American Sales, testified that of all of the
    identified retailers in the U.S. who were potential customers of snow products, he focused on ██

24  ██████████████████, the accounts that Pedersen had told Rios he was keeping in-

25  house.  (SGI ¶ 204).

26  [7] Gary Smick, T4K's outside sales representative primarily for ████████., received that email
    and was upset by it because he understood it to mean that he would be replaced for ongoing

27  sales efforts to ████████.  Weenink later reassured Smick that, consistent with Pedersen and
    Rios's agreement, sales efforts to ████████ would not be handled by the distributor (Sport

28  Dimension).  (SGI ¶ 173.)

1    <u>Second</u>, despite the parties' agreement that ███ was on the "hands off" list and

2    Rios's subsequent March 26, 2009 confirmation that T4K would be "calling on ████

3    ███," SD began pursuing distribution of a competing snow bike with ████████ as

4    early as January 2010.  (SGI ¶ 275.)  In early 2010, SD shipped samples to

5    ███, but because it was unable to brand the product in time, it did not successfully

6    sell the Yamaha snow bike to ████████. until the 2011 season.  (SGI ¶ 190.)  SD

7    simply decided it could make more money selling a copycat product rather than distribute

8    T4K's products, as it had promised to do.  (SGI ¶ 205).

9    **D.    Pedersen Provides Proprietary Trade Secret Information to Rios**

10   Pedersen provided Rios with the following proprietary information during, and

11   after, their contract negotiations: (1) T4K's cost for the Snow Moto was close to ███

12   (SGI ¶ 207); (2) specific retailers purchasing the Snow Moto from T4K or who were

13   being targeted as potential customers (SGI ¶ 208); (3) special wholesale pricing of ████

14   ████ which no other customer had received (SGI ¶ 209); (4) T4K's pricing strategy[8];

15   (5) a sales pitch book reflecting a new Snow Moto product line with new features (all of

16   which SD ultimately copied) (SGI ¶ 211); and (6) password protected "point-of-sale" and

17   marketing information for Snow Moto sales at ███████████ containing

18   metrics showing, e.g., that the Snow Moto was flying off the shelves – something that no

19   one walking through the stores cannot determine.[9]  (SGI ¶ 212.)  Pedersen would not

20   have provided this information to SD but for his belief that SD was genuinely interested

21

22   ───────────────────
     [8] The strategy involved persuading retailers that they can accept a ███ margin on the Snow

23   Moto, as opposed to the customary ████ margin for sporting goods, because ████████

24   ███  (SGI ¶ 210.)

25   [9] For example, the ██████ metrics included the following: ████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████

28   ████████████████████████████  (SGI ¶ 217.)

in distributing the Snow Moto.  (SGI ¶ 268.)

Pedersen asked Rios to keep it confidential.  (SGI ¶ 213.)  The confidentiality of the information would have gone without saying because Rios and Lin testified that they regarded margin and cost information as proprietary, that is, they would not want their competitors to have it.  (SGI ¶ 214.)[10]

**E.**    **SD Uses the Information It Obtained Under the Guise of a Distribution Relationship to Enter the Market**

In January 2010, less than nine months after the parties entered into the distribution agreement and only five months after Rios told Pedersen that not a single retailer in the United States was interested in T4K's snow bikes, SD had developed a competing snow bike that was 90% completed.  (SGI ¶ 189.)  At that time, Rios offered the product to ████████.  (SGI ¶ 190.)

SD decided to enter the market, and developed its competing product, using the complete mix of information that Rios obtained from Pedersen.  Lin testified that before entering a category, he would want to know the anticipated profit margin, consumer interest and retailer interest, all of which he (through Rios) was able to obtain from Pedersen without conducting any market research, including the product's sell thru rate. (SGI ¶ 215.)  The confidential ████ data indicated to SD that the Snow Moto was achieving an almost unprecedented retail sales rate.  (SGI ¶ 216.)  Based on SD's access to T4K's cost and special wholesale pricing, SD would have been able to calculate the profit margin that T4K earned from Snow Moto sales.  (SGI ¶ 218.)  SD manufactured a near identical version of T4K's Snow Moto and licensed it under the Yamaha brand. (SGI ¶ 219.)  SD then used its understanding of T4K's underlying cost and pricing strategy to undercut T4K's pricing.  For example, ***SD's pricing to*** ████ ***was*** ████, ***just below the*** ████ ***special wholesale pricing that T4K had offered to SD* –**

---

[10] Indeed, during discovery in this case SD marked documents fitting into any of the above categories as "Highly Confidential – Attorneys' Eyes Only."  (Lawrence Decl. Exs. O, U.)

8

1 *something that no one other than SD knew about.*   As a result, despite the

2 unprecedented sales volume that ███████. realized from the Snow Moto product

3 during the 2010 season, in 2011, ███████ purchased SD's Yamaha snow bike instead.

4 ### F.   SD's Fraud

5       Rios had represented to Pedersen that SD wanted to be T4K's U.S. distributor, to

6 assist T4K in increasing its U.S. market share, would try to sell as many Snow Motos as

7 possible, and sought "any support to help us become the experts in your category"

8 because "we see this as a great opportunity to help get more exposure for your product in

9 the market." (SGI ¶ 152.)  At no time from that point forward did Rios ever disclose to

10 Pedersen that SD was considering making a competing product.  In fact, when Pedersen

11 asked Rios what other snow products were being offered by SD, Rios only mentioned

12 foam and molded sleds and helmets.  (SGI ¶ 220.)

13       Pedersen relied on Rios' representations by (a) providing proprietary information

14 to SD to assist it in its sales efforts, which SD then used to enter the market with its own

15 product; (b) disclosing confidential pricing and cost information to SD, which SD then

16 used to undercut T4K's pricing; (c) agreeing to permit SD to hold itself out as T4K's

17 U.S. distributor, which allowed SD to go on a "fact finding mission" to determine

18 customer interest; and (d) reducing T4K's sales efforts in the U.S.  Rios's representations

19 were false and his failure to tell Pedersen that SD was considering developing a

20 competing product was clearly material.

21       Moreover, in order to have an almost completed snow bike in January 2010 and

22 samples ready in February 2010, SD must have started its development efforts at or

23 around the time of the parties' discussions because (a) Rios testified that it could take up

24 to 18 months to develop a product; (b) Lin testified that it generally takes longer to

25 develop a 3-D product (like a snow bike); [11] and (c) in T4K's experience, it takes at least

26

27 _____

[11] When presented with the "90% completed" document at his deposition, Lin conveniently
suggested that the product may have been a "stock" item from the factory.  When asked why

28 then was the product only 90% completed, Lin had no response.  (SGI ¶¶ 227, 228.)  Rios

a year to design a product and set up the tooling to manufacture samples and it actually took T4K twelve to fourteen months to develop the Snow Moto.  (SGI ¶ 224.)

In addition to not telling Pedersen that it was considering making a competing snow bike, SD went one step further by secretly copying T4K's snow bike – the very product it was supposed to be distributing.  On February 2, 2010, less than a year after the parties entered into the distribution agreement, Alex Fung of Stallion, SD's Hong Kong agent, sent a picture of T4K's Ski-Doo snow bike to Rios stating, "***See attached picture of the Ski-doo snow bike that we want to use Yamaha's brand on this item.***" (Emphasis added) (SGI ¶ 225.) Even though Lin received this email, he did not instruct Fung not to copy T4K's snow bike.  (SGI ¶ 226.)

## III.   ARGUMENT

### A.   <u>Disputed Issues of Material Fact Preclude Summary Judgment of T4K's Trade Secret Misappropriation Claim</u>

SD raises a number of arguments in purported support of summary judgment. (Mot. at 11-14.)   Each of these arguments only serves to highlight the multitude of disputed factual issues.  *See In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 306 (2002) (whether information qualifies as a trade secret and whether reasonable efforts were taken to protect it are inherently questions of fact).

#### 1.   <u>T4K's Confidential Information Qualifies as Trade Secrets</u>

SD first claims that the trade secrets that T4K has identified are "either publicly available or readily accessible in the industry." (Mot. at p. 11.)  Whether a trade secret is "publicly available" or "readily ascertainable" presents an inherently fact driven inquiry. *See Fields v. QSP, Inc.*, 2012 WL 2049528, at *14 (C.D. Cal. June 4, 2012) ("[w]hether QSP's Database is a trade secret, however, is inherently fact based and thus inappropriate to decide at the summary judgment stage); *San Jose Const., Inc. v. S.B.C.C., Inc.*, 155

testified that Stallion in fact had designed the product and provided renderings to SD.  (SGI ¶ 229.)

LA 130886696v1

1  Cal. App. 4th 1528, 1537 (2007) ("[w]hether information is a trade secret is ordinarily a

2  question of fact."); *Thompson v. Impaxx, Inc.*, 113 Cal. App. 4th 1425, 1430 (2003).

3      <u>Moto X Recap</u>. The document contains Snow Moto sales metrics indicating

4  extremely successful sales, including (1) the all-important sell thru rate (" ▮▮ sell thru,"

5  " ▮▮ of stores sold greater than ▮▮ of their total shipped inventory in less than one

6  week," and "Avg. unit sales per store were ▮▮▮▮▮ . . . ."). This information

7  is impossible to obtain by simply looking at store shelves; and (2) future marketing

8  strategies for selling Snow Motos ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10 ▮▮▮▮▮▮▮▮▮▮) – something that SD would not have known

11 because it was not selling snow bikes at the time. (SGI ¶ 217.)

12     SD disputes that this document contains trade secrets because it was " ▮▮▮ ,

13 not T4K's marketing and sales information." (Mot. at 12.) But the "point of sale"

14 information pertains to T4K's products, can only be obtained by using a T4K user

15 specific password, and reflects the "extremely confidential . . . success rate of our product

16 at retail." (SGI ¶ 231, 232.) ▮▮▮ allows each vendor to access only its own POS

17 information and not that of any other vendor.[12] (SGI ¶ 269.) That the information was

18 generated by T4K from ▮▮▮ database does not make it any less confidential

19 because the information was available only to ▮▮▮ and the vendor, and not the

20 vendor's competitors. *See In re Electronic Arts, Inc.*, 298 Fed. App'x 568, 569 (9th Cir.

21 2008) (trade secret is information unknown by a competitor).

22     <u>"USA Distribution" Email</u>. As discussed in detail above (*supra* at p. 7-8), during

23 their negotiations over email, based on his belief that SD was genuinely interested in

24 distributing the Snow Moto, Pedersen provided Rios with valuable confidential

25

26

_____

27 [12] ▮▮▮ computer program allows vendors to determine various metrics so they can track
how well their products are doing, which products are selling, how they should market their
28 products and how they should plan for future shipments.

information relating to costs, pricing, and marketing.[13]  (SGI ¶¶ 206-211.)  None of this information was known to SD because it was not selling snow bikes at the time.  *See Hilderman v. Enea TekSCi, Inc.*, 551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (disputed issue as to whether pricing information was publicly known); *Robert Half Int'l, Inc. v. Murray*, 2008 WL 2625857, at *5 (E.D. Cal. June 25, 2008) (disputed issue whether customer lists are trade secrets).

"Quote Sheet" Document. This document contains shipping specifications, container quantity information, and the name of the factory at which the Snow Moto was manufactured. (SGI ¶ 233.)  SD claims that this is publicly available because shipping information is exchanged with "factories and buyers" and the particular factory at which a product is manufactured is available online. (Mot. at 12.)   Shipping information is valuable to a competitor's determination of a vendor's underlying expenses such as shipping costs.[14]   Moreover, SD has not shown that T4K's factory can be found online. Given that there was no product like the Snow Moto in March 2009, none of the above pricing, cost, margin, sell thru, marketing, or shipping information provided by Pedersen would have been readily available to the industry or SD in particular.[15]  (SGI ¶ 237.)  *See Lifetouch Nat. Sch. Studios, Inc. v. Moss-Williams*, 2011 WL 3759940, at *2 (N.D. Cal. Aug. 25, 2011) ("Trade secrets may constitute cost and pricing information not readily known in the industry.") (quotations omitted).

_____

[13] While the presentation of T4K's future products was shown to ████, both Pedersen and Rios testified that retailers do not share a vendor's information with other vendors.  (SGI ¶ 270.)

[14] The fact that T4K may have provided this information to its factory is irrelevant because T4K had a confidentiality agreement with its factory and, therefore, the Quote Sheet information would have remained protected.  (SGI ¶ 236.)

[15] Sport Dimension cites the *Steinberg* case for the proposition that data such as "costs, margins, or projections . . . would not qualify as a trade secret." (Mot. at 12 (citing *Steinberg Moorad & Dunn, Inc. v. Dunn*, 136 Fed. Appx. 6, 12-14 (9th Cir. Cal. 2005)).  However, as Sport Dimension's own quote recognizes, that is only the case "if the methods for setting such commonly-used industry formulas" are known.  SD has not shown that the information provided by Pedersen was commonly known or readily ascertainable.

LA 130886696v1

T4K's trade secret claim is also premised on SD's use of *all of the information*, in aggregate, to enter the snow bike market. As a matter of law, "[a] trade secret may [be] comprised of partly or entirely non-secret elements and still merit protection." *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1194 (S.D. Cal. 2012); *see also Electronic Arts, Inc.*, 298 Fed. App'x at 569; *Clark v. Bunker*, 453 F.2d 1006, 1010 (9th Cir. 1972) (secrecy of trade secret "is not negated because defendant by an expenditure of effort might have collected the same information from sources available to the public."). The various pieces of T4K information described above were not publicly available. But even if they separately were, the compiled information – essentially a playbook – to T4K's entire Snow Moto business was not publicly available.

## 2.   T4K Took Reasonable Efforts to Protect its Trade Secrets

"[W]hether a party claiming a trade secret undertook reasonable efforts to maintain secrecy is a question of fact." *In re Providian Credit Card Cases*, 96 Cal. App. 4th 292, 306 (2002)); *Mattel, Inc. v. MGA Entm't, Inc.*, 2011 WL 3420571, at *2 (C.D. Cal. Aug. 4, 2011) ("[t]he determination of whether "reasonable efforts" have been taken is quintessentially fact-specific."). Indeed, "[o]nly in extreme cases is it appropriate to take the issue [of whether reasonable precautions were taken] away from the jury." *Id.*

SD argues that because it was a competitor, T4K acted unreasonably by not requiring Rios to execute a confidentiality agreement. (Mot. at 13.) Yet, one of the central issues is whether SD led T4K to believe that it was not a competitor, but rather, was interested in a distribution relationship. Indeed, Lin, himself, disputes that SD and T4K are competitors. (SGI ¶ 271.)

Moreover, the industry custom is that pricing and product information is understood to be confidential even without a formal confidentiality agreement. (SGI ¶ 238.) For example, all of the witnesses testified that retailers do not share one vendor's information with another vendor. (SGI ¶ 238.) There are circumstances under which it is reasonable to rely on the understood or implicit confidentiality of information. *See Diodem, LLC v. Lumenis Inc.*, 2005 WL 6220720, at *10 (C.D. Cal. Sept. 16, 2005)

13

("sufficient evidence from which a reasonable jury may infer that [defendants] were subject to an implied confidentiality obligation."); *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*, 267 F. Supp. 726, 732-33 (S.D. Cal. 1966), modified, 407 F.2d 288 (9th Cir. 1969) (question of fact as to whether there is an implied understanding of confidentiality); *Burten v. Milton Bradley Co.*, 763 F.2d 461, 463 (1st Cir. 1985) (implied confidential relationship "between . . . purchasers and suppliers, or prospective licensees and licensors.") (citations omitted).

In any event, there is substantial evidence that Pedersen's efforts were reasonable under the circumstances. <u>First</u>, Pedersen asked Rios to keep the information confidential before he provided it to Rios. (SGI ¶ 213.) Second, the March email exchange between Rios and Pedersen reflects an understanding that certain proprietary product and marketing information would be provided for the specific purpose of selling T4K's products to U.S. retailers. Third, T4K generally took reasonable measures to protect its information:

- T4K employees execute a confidentiality agreement and the employment manual requires employees to maintain the secrecy of product, sales and financial information.[16]

- T4K manufacturing agreements contain provisions requiring that the manufacturer protect T4K's broadly defined "Confidential Information."

- T4K hard copy files containing proprietary information are generally maintained in locked desk drawers or file cabinets.

- Prior to sharing proprietary or potentially proprietary information with a third party, a T4K representative will admonish the third party recipient not to share or

---

[16] In addition, entry to the T4K offices requires a pass key and disarming the alarm with a passcode unique to each employee. An alarm monitors the premises during off hours. T4K's electronic files are maintained on secure file servers accessible only upon entry of an authorized unique login ID and password. Network folder accesses are granted based on the predefined network user group which is determined based on the job responsibilities. (SGI ¶ 242-244.)

14

1  inappropriately use such information, which includes using such information to
2  compete with T4K.
3  (SGI ¶¶ 239, 241, 245, 256.)  As the foregoing demonstrates, T4K takes reasonable – and
4  substantial – measures to secure its trade secret information and SD has failed to
5  demonstrate a lack of disputed fact as to the reasonableness of those measures.
6         3.   <u>SD Used T4K's Proprietary Information</u>
7      To obtain summary judgment on the question of "use," SD must "show no triable
8  issue exists with respect to the question of whether [it] misappropriated the alleged trade
9  secrets by the use or disclosure thereof" or show that T4K " will be unable to offer such
10  evidence at trial."  *MMCA Grp., LTD v. Hewlett-Packard Co.*, 2010 WL 147937, at *4
11  (N.D. Cal. Jan. 12, 2010) (citations omitted).  SD's Motion falls short of doing so.
12      SD offers the threadbare declaration of ▮ Buyer ▮ who states in
13  conclusory fashion that "[a]t no time did SDI present me with confidential information
14  from T4K." ( ▮ Decl. at ¶ 8.) ▮ fails to explain whether he understands the
15  legal meaning of a trade secret, what he believes to be T4K's confidential information or
16  how he would know if he received it.  For example, ▮ was presented with a quote
17  for SD's Yamaha snow bike at ▮ per unit.  It bought this product.  But ▮ could
18  not have known that the pricing submitted by SD constituted inappropriate use because it
19  was ▮ below the special wholesale price of ▮ given by Pedersen to Rios – a
20  price that Pedersen had never offered to anyone else.[17]  (SGI ¶ 273.)
21      Moreover, SD used the entire recipe provided by Pedersen, i.e., cost, pricing,
22  proposed retailer margin, new product features, phenomenal sell-thru rate – all of the
23  information Lin admitted he needed to know – to enter the market.  *Aqua-Lung Am., Inc.*
24  *v. Am. Underwater Products, Inc.*, 709 F. Supp. 2d 773, 788 (N.D. Cal. 2010), is
25
26  ───────────
   [17] The point of the distribution agreement, as both parties acknowledged at the time, was to
27  enhance T4K's penetration into the U.S. market in exchange for sharing margin with SD.
   Therefore, T4K's pricing directly offered to retailers was higher than the special wholesale
28  pricing given to SD.  (SGI ¶ 274.)

LA 130886696v1

instructive.   There, the plaintiff offered evidence that the defendant's use of the misappropriated trade secret allowed it to develop a product six months earlier than it otherwise would have.  *Id.*  In denying summary judgment, the court concluded that "[d]isclosure and/or use of the trade secret in question is a crucial element of a misappropriation claim, and [plaintiff] has made a sufficient showing that genuine issues of material fact exist on this element."  *Id.*

SD also argues that "given that SD launched the Yamaha snow bike two years after brief discussions with T4K, it is unclear what information . . . could have been protected after such a long time had passed." (Mot. at 14.)  This statement is misleading. SD had a product that was 90% complete in January 2010, shipped samples to ██████ in early 2010 and in early 2010 pursued Yamaha for a license (and in the process told Yamaha that its product will have all of the new features of T4K's products).[18] (SGI ¶ 275.) Even if it is true that SD only successfully sold the Yamaha snow bike in early 2011, that development began prior to 2010 and SD began offering a snow bike in January 2010.  In sum, there is ample evidence of use of T4K's proprietary information.

**B.     Disputed Issues of Material Fact Preclude Summary Judgment of T4K's Fraud Claims**

　　　　　1.     SD Made False Representations and Omissions of Material Facts

Feigned Interest in Distributing Snow Moto (First Fraud Claim).  In his emails to Pedersen, Rios repeatedly indicated SD's interest in entering into a distribution agreement.  (SGI ¶ 277.)  He also conveyed the belief that they had reached an agreement. (SGI ¶¶ 149, 153, 154.)  If it is now SD's position that there was no agreement formed, then Rios's statements to Pedersen, indicating a contractual relationship and attempt to perform, were necessarily fraudulent.  Moreover, a disputed issue exists as to when SD

---

[18] The new product presentation that Rios obtained from Pedersen showed that the upcoming Snow Motos would have front end suspension, full braking system, adjustable seats, twin tip skis and grip guards.  Rios's February 2010 presentation to Yamaha indicated that SD's product would also have "[f]ront flex suspension, . . . [m]etal snow brake, [i]nnovative seat and twin tip skis design [and] pro grip hand protectors."  (SGI ¶ 276.)

began designing its own product. (*Supra* at 16.) If it is determined that SD was working on its own product when Rios approached Pedersen, that will further prove that SD committed fraud by feigning interest in T4K's product when obviously planning on competing against T4K instead.

<u>Efforts to Sell the Snow Moto (Second Fraud Claim)</u>.   On April 16, 2009, Rios informed Pedersen that "[w]e are getting very close to a 100 club test with Ski-Doo" at ████████ (SGI ¶ 251.)   Several weeks later, on May 5, Pedersen inquired as to the status of sales.   (SGI ¶ 175.)   Again, Rios responded that "[w]e are waiting for confirmation on a 100 club test with the Ski-Doo brand. . . . we should have confirmation by the end of the week." (SGI ¶ 175.)   Another two months passed and when Pedersen inquired again, Rios finally informed him that ████████ had decided not to proceed with the test. (SGI ¶ 177.)   SD has produced no evidence that ████████ responded to Rios's initial April 2 offer email and indicated an interest in conducting a 100 store test sale of the Ski-doo or that ████ changed its mind in July, as Rios had represented to Pedersen. (SGI ¶ 252.)   Likewise, ████████ did not produce any such evidence in response to T4K's subpoena. (SGI ¶ 253.)

Similarly, in his May 6 email, Pedersen asked Rios for the status of sales to other accounts aside from ████████.   Rios responded that "price has been an issue" but deferred to Richards for a more detailed update on SD's "snow bike ***program***. (emphasis added)"   Richards responded May 8, 2009 that "[t]he ***presentations*** I have done with several accounts all noted the same thing.   There is not enough margin in the item and ████ is definitely the ceiling retail price.   Most buyers commented that they liked the item." (SGI ¶ 176 (emphasis added).)   Yet, Richards has now testified that he gave no real presentations.   He simply made a single phone call to several buyers, mentioned the snow bike to them, did not present them with any photographs, samples or other materials, and did not pitch the Snow Moto in person. (SGI ¶ 179.)   Rios's reference to SD's "snow bike program" and Richard's use of the word "presentations" – when he later admitted that he had conducted none – amount to active misrepresentations to Pedersen.

17

(SGI ¶ 179.)  It appears that by the time SD made those representations to Pedersen, it was already developing a competing product and was not interested in selling the Snow Moto. (SGI ¶ 189.)  Rios almost admitted as much when he stated that Richards was using the T4K snow bike to go on a "fact finding mission." (SGI ¶ 278.)

SD's Failure to Inform T4K About Competing Product (Second Fraud Claim).  As described above, SD began offering its own product in January 2009.  *It is undisputed that SD never informed T4K at any point that SD was contemplating a snow bike of its own.*  (SGI ¶ 187.)  Thus, a further disputed issue exists regarding whether SD had a duty to inform T4K that it was designing and marketing a competing product and, if so, when that obligation arose. *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984) (denying summary judgment in light of fact questions on defendant's duty to plaintiff).

2.    Whether SD Had Fraudulent Intent is an Inherently Factual Question

SD claims that this is a case of "promissory fraud" and, therefore, T4K must demonstrate that SD did not intend to perform at the time the promises were made.  (Mot. at p. 20.)  There is ample circumstantial evidence regarding SD's and Rios' fraudulent intent. *See AMC Tech., LLC v. Cisco Sys.*, Inc., 2012 WL 174949, at *3 (N.D. Cal. Jan. 20, 2012) ("fraudulent intent can be established by circumstantial evidence" and "the issue of fraudulent intent is one for the trier of fact to determine based on particular facts . . . .").  Indeed, there is no stronger evidence of SD's fraudulent intent than its half-hearted sales efforts and failure to sell even a single Snow Moto after promising to use its best efforts. *See AMC Tech., LLC v. Cisco Sys.*, Inc., 2012 WL 174949, at *3 (N.D. Cal. Jan. 20, 2012) (failure to perform under agreement is circumstantial evidence of fraudulent intent).  Given SD's failure to sell a single item, and development of a competing product, there is ample evidence giving rise to a disputed issue of material fact regarding fraudulent intent.

SD also argues that "T4K cannot point to any representation by Mr. Rios that he would not approach ████. regarding SD's snow bikes." (Mot. at 21.)  That Rios

18

did not tell Pedersen that SD was contemplating selling its own snow bike is itself fraudulent.  Moreover, that SD sold its own product to ███ at the same time it had agreed to distribute T4K's product to other retailers is evidence of SD's intent to mislead T4K.  *See Patriot Rail Corp.*, 2011 WL 318400, at *10 (circumstantial evidence of intent between parties to a contractual relationship).

Finally, SD contends that the statements relating to SD's efforts to sell T4K's Snow Moto were true because "SD did, in fact make efforts to sell T4K's snow bike to U.S. retailers, including ███".  (Motion at 21.)  Putting aside that this is inconsistent with SD's position that there was no agreement to sell T4K's products, this also raises a triable fact.  The only evidence of any sales efforts is a single quote sheet provided to ███.  (SGI ¶ 158.)  There is no evidence of any of the other sales efforts or communications as Rios and Richards represented to Pedersen in 2009.  In fact, Rios verified, under oath, SD's initial interrogatory response which stated the only customer SD approached regarding T4K's products was ███.[19]  (SGI ¶ 279.)  Thus, a jury must be permitted to assess Rios' and Richards' credibility to determine whether, as a factual matter, their representations to Pedersen were true.

### 3.   T4K Relied on SD's Misrepresentations and Omissions

Pedersen relied on Rios' representations by (a) providing proprietary information to SD to assist it in its sales efforts; (b) disclosing confidential pricing and cost information to SD; (c) agreeing to permit SD to hold itself out as T4K's U.S. distributor; and (d) reducing T4K's sales efforts in the U.S. (*See supra* at 5, 7-10.)

SD attempts to rebut reliance with three arguments none of which are meritorious. First, SD claims that there was no reliance because T4K sold snow bikes to US customers in 2010.  Yet, the record demonstrates that T4K did not approach any of the customers

---

[19] The evidence that a witness lied under oath on a prior occasion may be considered, along with all other evidence, for the limited purpose of deciding whether or not to believe the witness and how much weight to give to the testimony of the witness. *See* Model Civil Jury Instructions for the Ninth Circuit, No. 2.8.

19

1  who Rios said SD had relationships with and only sold a small number of snow bikes to

2  two new U.S. retailers in 2010 – ███, a company SD had not approached and an

3  online wholesaler (on a small quanity).[20]  (SGI ¶ 280.)  SD also argues there was a lack

4  of reliance because T4K sold snow bikes to ███ in 2009.  But T4K expressly told SD

5  that it would handle ███ o.  (SGI ¶ 148.)  Finally, SD asserts that T4K approached "███

6  ██████ and other customers," yet there is no evidence at all to support this

7  contention.  (SGI ¶ 281.)  "Because of the highly subjective nature of a causation

8  analysis, the Supreme Court of California has instructed that the question whether a party

9  detrimentally relied on the misrepresentation of another party is properly left to a jury."

10  *Am. Gen. Life Ins. Co. v. Fernandez*, 2012 WL 5267703, at * 4 (C.D. Cal. Oct. 24, 2012).

11  **C.    Factual Issues Preclude Summary Judgment of T4K's Tortious**

12  **Interference Claim**

13  T4K's claim for tortious interference with prospective economic advantage is

14  premised on SD's misappropriation of the ██████. snow bike business from T4K.

15  (SAC at ¶ 101.)  SD seeks summary judgment on the grounds that (1) there is no

16  independently wrongful act; and (2) there was no reasonable expectation of economic

17  advantage.  SD is wrong on both counts.

18  First, as demonstrated above, SD's fraudulent conduct and misappropriation of

19  T4K's proprietary information are independently wrongful acts.  *BioResource, Inc. v.*

20  *U.S. PharmaCo Distribution, Ltd.*, 2010 WL 3853025 (N.D. Cal. Sept. 29, 2010) ("fraud

21  and misrepresentation can constitute independently wrongful conduct"); *Gartner, Inc. v.*

22  *Parikh*, 2008 WL 4601025 (C.D. Cal. Oct. 14, 2008).

23  Second, whether expectations of a future economic advantage are "reasonable" is a

24  question of fact.  *See Tri-Growth Ctr. City, Ltd. v. Silldorf, Burdman, Duignan &*

25

26  [20] The Motion relies on Exhibit 10 to the Weenink deposition which sets forth a wish list of
27  which retailers Weenink believed would be interested in T4K's snow products.  Yet, Weenink
   testified that it was simply a wish list and he was focusing his sales efforts on ██████
28  ██████ (Weenink 134:25-136:19.)

LA 130886696v1

*Eisenberg*, 216 Cal. App. 3d 1139, 1153 (1989) ("it is a question of fact whether the business relationship between the plaintiff and third party is sufficient to support the tort."). Here, there is substantial evidence that supports a reasonable expectation of obtaining business from ███████. for the 2011 snow year.  During the preceding 2010 snow year, ████████. was selling the Polaris so quickly that it was forced to order an additional ████ units mid-season. (SGI ¶ 126.)  During a meeting for the 2011 season, ████████ head buyer, ████████, said he was very happy with the 2010 Polaris sales. (SGI ¶ 255.)  Gary Smick, who has been selling to ████ for approximately thirty years, testified that under normal circumstances ████ would re-purchase a product that had that high level of success the preceding year.  (SGI ¶ 283.)  Indeed, ████ did end up buying virtually the same product – only from SD at a lower price.  (SGI ¶ 284.) Moreover, ████████ has sold the Polaris for six consecutive years given its high success rate.  (SGI ¶ 257.)  T4K's expectation is also demonstrated by (a) its 2011 forecast for ████ sales; and (b) the clear shock when it learned from Smick that it had lost the ████. business.  (SGI ¶ 285.)

**D.     The Parties Formed a Distribution Agreement and SD Breached It**

SD seeks dismissal of T4K's claims sounding in contract (breach of contract, promissory estoppel and breach of the implied covenant of good faith and fair dealing) on the grounds that (1) a contract is barred by the statute of frauds; (2) the parties failed to memorialize their agreement in an MOU; (3) there was no meeting of the minds on material terms; (4) T4K did not provide value; and (5) there is no evidence of breach. Each of these arguments fails.

**1.     The Statute of Frauds Does Not Apply Here**

A "contract is unenforceable only where *by its terms* it is *impossible* of performance in the period.  If it is merely unlikely that it will be so performed, or the period of performance is *indefinite*, the statute does not apply."  *See* 1 Witkin Sum. Cal. Law Contracts § 365) (emphasis in original); *White Lighting Co. v. Wolfson*, 68 Cal. 2d 336, 343 fn. 2 (1968) (emphasis in original) ("the agreement must be one of which it can

1  truly be said at the very moment it is made, 'This agreement is not to be performed

2  within one year'; in general, the cases indicate that there must not be the slightest

3  possibility that it can be fully performed within one year."). The distribution agreement

4  here is not one that, by its terms, is impossible to perform within one year. In any event,

5  the March 2009 email is a writing sufficient to satisfy the statute of frauds.[21]

6        2.   The Failure to Execute an MOU is Not Fatal to the Contract

7  SD claims that the contract between the parties is not binding because the parties

8  never executed an MOU. (Mot. at 15-16.)[22] Yet, Pedersen testified that the email chain

9  itself functioned as the MOU between the parties because it contained all of the material

10  terms discussed, including products, price, accounts, quantity, and marketing support.

11  (SGI ¶ 286.) Moreover, if there was no agreement, why did SD "make efforts to sell

12  T4K's snow bike to U.S. retailers, including ███████," as it contends in its Motion?

13  (Motion at 21.) As explained above (p. 4.), both the email chain and the parties'

14  subsequent conduct confirm an agreement. Accordingly, if at some point, performance

15  was made contingent on execution of an MOU, the parties clearly waived that condition

16  when they tried to perform the agreement. *Jeffrey Kavin, Inc. v. Frye*, 204 Cal. App. 4th

17  _____

18  [21] "The statute of frauds does not require a written contract; a 'note or memorandum…

19  subscribed by the party to be charged' is adequate." *Sterling v. Taylor*, 40 Cal. 4th 757, 765-66 (2007) (citing Cal. Civ. Code § 1624(a)).

20  [22] Sport Dimension cites a number of cases for the proposition that "the understanding is not

21  binding until the written agreement is actually executed." (Mot at 15-16.) These cases are inapposite. In *Banner Entm't, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*, 62 Cal. App.

22  4th 348, 359 (1998), the parties entered into a basic oral agreement and then negotiated a written agreement that they never executed. Here, the parties did enter into an unambiguous written

23  agreement the terms of which are clear. The case of *Apablasa v. Merritt & Co.*, 176 Cal. App.

24  2d 719, 730 (1959) stands for the proposition that there is no binding contract when the parties have expressly agreed "that it shall not be binding until evidenced in writing." Here, although

25  the parties made occasional reference to an MOU, the agreement was not expressly made contingent on execution of one. In any event, when dealing with a contract for the sale of

26  goods, any manifestation of intent to enter a contract is sufficient. *See* California Commercial

27  Code § 2204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a

28  contract.").

35, 45 (2012) (party can waive condition to a contract including manner of acceptance).

### 3.   There Was a Meeting of the Minds and SD Provided Value

Given the unambiguous terms of the email chain, as well as the subsequent conduct of the parties, there can be no genuine dispute as to a meeting of the minds.  "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *See* Cal. Comm. Code § 2204(1).  Here, the March 2009 email exchange was a writing sufficient to show the material terms of an agreement.  *See E. & J. Gallo Winery v. Andina Licores S.A.*, 440 F. Supp. 2d 1115, 1129 (E.D. Cal. 2006) (quotations omitted). After discussing the particular products to be sold, the customers to whom those products would be sold and the special wholesale price that SD would pay for those products, Rios responded, "Brad, We are good to go.  We accept your new higher prices listed below along with ██ service fee for shipping." (SGI ¶ 34.)  Rios also promised to keep Pedersen apprised of SD's progress in selling the Snow Moto models to U.S. retailers. (SGI ¶ 35.)  Although in email form, the terms of the written agreement are unambiguous on their face and the Court can therefore determine them as a matter of law. *Waterbury v. T.G. & Y. Stores Co.*, 820 F.2d 1479, 1481 (9th Cir. 1987).

SD contends that there could not have been a meeting of the minds because the email exchange lacked material terms such as "duration or termination, . . . quantity, which customers are 'off limits' and market readiness." (Mot. at 16.)  <u>First</u>, there is no requirement that an agreement for the sale of goods contain a duration and one that does not is simply terminable at will ***after reasonable notice***.  *See McCaskey v. Cal. State Auto Ass'n*, 189 Cal. App. 4th 947, 966-67 (2010).  Thus, lack of duration does not frustrate contract formation and SD never gave notice of termination.  <u>Second</u>, the absence of a quantity term is not fatal to the distribution agreement between the parties because Rios committed to selling as many units as SD could and, therefore, established a requirements quantity term.  *See* Cal. Comm. Code § 2306(1) ("A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual

23

1  output or requirements as may occur in good faith . . . ."); *Seaman's Direct Buying Serv.,*
2  *Inc. v. Standard Oil Co.*, 36 Cal. 3d 752, 763 (1984) ("The October 11th letter is
3  evidence of a dealership arrangement. The obvious implication of such an arrangement is
4  that the wholesaler will supply as much fuel as the dealer requires."). <u>Third</u>, as explained
5  on page 3, the email exchange clearly reflects the accounts which were off limits to SD.
6  This is corroborated by Rios's subsequent confirmation on March 26 that T4K was
7  "calling on ███████." (SGI ¶ 287.)[23]

8      T4K extended special wholesale pricing to SD and remained ready and willing to
9  do so. (SGI ¶ 156.) This is adequate consideration. *See Gallagher v. Holt*, 2012 WL
10  3205175, at *10 (E.D. Cal. Aug. 3, 2012) ("price agreed to be paid" is either a benefit
11  conferred on the defendants or a prejudice suffered by the plaintiffs).

12      SD also contends that the only value T4K could have provided would have been an
13  exclusive distributorship. (Mot. at 17.) The parties, however, did not discuss exclusivity,
14  let alone, agreed to it. Rather, it appears SD is only suggesting now what it appears the
15  terms of the deal should have been then. A party's belief as to the terms of an agreement
16  in hindsight is irrelevant. *See Founding Members of the Newport Beach Country Club v.*
17  *Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003) ("parties'
18  undisclosed intent or understanding is irrelevant to contract interpretation.").

19          4.   <u>There is Substantial Evidence of Breach</u>

20      SD asserts it did not breach the agreement because it was not obligated to sell a
21  specific number of units. The agreement constituted a requirements contract pursuant to
22  which SD committed to selling as much as it could in exchange for T4K's special
23  wholesale pricing. *See* Cal. Comm. Code § 2306(1) (requirements contract for the sale of
24  goods). It is undisputed that SD failed to do so. (*See supra* at p. 6.)

---

[23] "Market readiness" is a red herring. The snow bikes were not CPISA certified in 2008
because that statute only applied to children's products manufactured after November 12, 2008.
When Rios inquired, Pedersen told him that the 2009 products would be CPISA certified and
they were. Moreover, SD claims it had tried to sell the products to customers; and (b) it is
undisputed that ████ bought them in 2009. (SGI ¶ 288.)

24

1   SD claims that selling its own snow bike to ██████ could not have been a breach

2   because "the alleged contract did not prevent SD from selling a competing product."

3   However, the parties were clear that the purpose of the agreement was to avoid

4   interfering with T4K's ongoing sales while allowing it to increase its exposure to new

5   U.S. retailers. (SGI ¶ 134.)  SD agreed not to approach ████████████████

6   because doing so would interfere with T4K's ongoing sales efforts with ██████████.

7   (SGI ¶¶ 145-148.)[24]  Pedersen made clear that he would reject any deal that permitted SD

8   to interfere with Tech-4-Kids' existing sales efforts. (SGI ¶ 145.)

### E.   Tech-4-Kids Was Damaged

10   Nelson's declaration establishes the requisite causation.  Nelson states that one of

11   the reasons he chose SD's snow bike over T4K's was its price.  (Nelson Decl. at ¶ 6.)

12   Armed with T4K's cost and pricing information, SD was able to undercut T4K's price by

13   more than ██ per unit.  (*Supra* at 15.)  T4K has been damaged.  (SGI ¶ 292.)  It lost U.S.

14   sales opportunities in 2009 and 2010 because it relied on SD to make those sales.  (SGI ¶

15   196.)  T4K did not approach ██████████, or any of the sporting goods retailers that T4K

16   believed SD had relationships with.  (SGI ¶ 171.)  It is undisputed that T4K lost the

17   ██████████. business to SD in early 2011.  (SGI ¶ 197.)  The amount of damages suffered

18   by T4K is an issue for the trial of fact.

19   DATED:  May 13, 2013                    **GREENBERG TRAURIG, LLP**

20                                                    By:   /s/ Valerie W. Ho

21                                                          Valerie W. Ho

22

23

24

25

_____

26   [24] Having established the existence of an agreement, the implied covenant of good faith and fair

27   dealing also applied.  SD's sale to ██████ violated the implied covenant because it undermined
     the express purpose of the agreement: (1) selling the Snow Moto to new U.S. retailers; (2) while

28   not interfering with Tech-4-Kids' then existing customer base or market share.